## UNITED STATES v. NORTHERN PACIFIC RAILWAY CO. ET AL.; and
## NORTHERN PACIFIC RAILWAY CO. ET AL. v. UNITED STATES.

Nos. 3 and 4. Argued March 4, 5, 1940. No. 3, reargued October 15, 16, 1940.—Decided December 16, 1940.

319

*Mr. Edward F. McClennen* and *Assistant Attorney General Littell*, with whom *Solicitor General Biddle*, and *Messrs. Walter L. Pope, E. E. Danly*, and *Robert K. McConnaughey*, and *Miss Margaret A. Shea* were on the brief, for the United States on the original argument in Nos. 3 and 4. *Mr. Frederick Bernays Wiener*, with whom *Solicitor General Biddle, Assistant Attorneys General Shea* and *Littell*, and *Mr. E. E. Danly* and *Miss Margaret A. Shea* were on the brief, for the United States on the reargument in No. 3.

*Messrs. John W. Davis* and *Lorenzo B. daPonte*, with whom *Messrs. Grandin Tracy Vought, Alfred N. Heuston*, and *John B. Marsh* were on the briefs, for the Northern Pacific Railway Company et al. on the original argument in Nos. 3 and 4 and on the reargument in No. 3.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

The cause brought here by these appeals involves the correlative rights of the United States and the Northern Pacific Railway Company arising out of the land grants in aid of the Northern Pacific Railroad Company.

By an Act of July 2, 1864,[1] designated persons were created a body corporate, Northern Pacific Railroad Company, which was authorized and empowered to lay out, locate, construct, and maintain a continuous railroad and telegraph line from a point on Lake Superior to Puget Sound, with a branch via the valley of the Columbia River, to a point at or near Portland, Oregon. (§ 1.)

The Act granted a right of way through the public lands, with additional lands for stations, etc., and the United States agreed that it would extinguish, as rapidly as consistent with public policy and the welfare of the Indians, the Indian title to all lands falling under the operation of the Act and "acquired in the donation to the [road]." (§ 2.)

In aid of construction, and to secure transportation of mail, troops, munitions, and public stores, every alternate section of public land, not mineral, was granted to the amount of twenty sections per mile on each side of the line through territories, and ten sections per mile through states. In case any of these sections had been granted, sold, occupied by homestead settlers, or otherwise disposed of at the time of definite location of the railroad opposite such sections, the company was to be entitled to select, in lieu thereof, alternate odd-numbered sections not more than ten miles beyond the limits of the grant. In lieu of mineral lands, the company might

---

[1] 13 Stat. 365.

select a like quantity of agricultural lands "nearest to the line of said road and within fifty miles thereof." (§ 3.)

Whenever twenty-five consecutive miles of any portion of the railroad and telegraph became ready for service, the President was to appoint three Commissioners to examine the same and, upon their favorable report, patents were to be issued to the company for the lands opposite the completed sections. This procedure was to be repeated as each section of twenty-five miles was completed. (§ 4.)

The grant was subject to the conditions that the company should commence work within two years and complete not less than fifty miles per year after the expiration of the second year, and complete and equip the whole road by July 4, 1876. (§ 8.) In the event of a breach of these conditions, not cured within one year, the United States might "do any and all acts and things which may be needful and necessary to insure a speedy completion of the said road." (§ 9.)

The capital stock was to be publicly offered to the people of the United States; no mortgage or construction bonds were to be issued, or any mortgage lien created, except with the consent of Congress. (§ 10.) The road was to be a post and military road, for the use of the United States, subject to regulations imposed by Congress restricting the charges for such use. (§ 11.)

The acceptance of the terms of the Act was to be signified in writing by the board of directors of the company within two years after the passage of the Act. (§ 12.)

Unless the company should obtain bona fide subscriptions to its stock in the amount of $2,000,000 with ten per cent. paid, within two years from the approval of the Act, the Act was to be null and void. (§ 19.)

Congress reserved power "at any time, having due regard for the rights of said Northern Pacific Railroad Company," to "add to, alter, amend, or repeal" the Act. (§ 20.)

The company claimed to have been duly organized and the incorporators filed the acceptance provided for in § 12 within two years.

The belief that the road could be financed by popular stock subscriptions proved unfounded. The time for commencing and completing the road was twice extended.[2] The date ultimately fixed for final completion was July 4, 1879. The tentative route adopted by the company showed a line reaching to Puget Sound via the Yakima River. Ultimately the line was so definitely located and constructed. In 1869 Congress gave consent to the issue of mortgage bonds,[3] and also authorized the company to extend a branch line from a point at or near Portland to a suitable point on Puget Sound and to connect the branch with the main line west of the Cascade Mountains but made no land grant except for the right of way.[4] The company did not avail itself of either of the privileges granted. May 31, 1870, Congress again authorized the company to issue bonds to aid in the construction and equipment of its road, to be secured by mortgage on all of its property, railroad, land grant, and franchise to be a corporation. It further authorized the location and construction of the main railroad via the valley of the Columbia River to Puget Sound and of a branch from the main line across the Cascade Mountains to Puget Sound, and made a grant of land in connection with the construction authorized between Portland and Puget Sound, on the same terms as the original grant. It also provided a second indemnity belt

---

[2] 14 Stat. 355; 15 Stat. 255.

[3] 15 Stat. 346.

[4] 16 Stat. 57.

extending ten miles beyond the first on either side of the right of way.[5]

Pursuant to this authority the company created bonds, secured by mortgage of the railroad and land grant. By December 30, 1871, the line was completed from Carlton, Minnesota, to the Red River at Moorhead; by the spring of 1873 it was completed to the Missouri River at Bismarck, a total distance of four hundred and twenty-four miles. During the same period the road from Portland to Puget Sound was constructed from Kalama, Washington, to Tacoma, a distance of one hundred and six miles. The land grant concomitant to this construction amounted to approximately ten million acres.

The panic of 1873 caused cessation of construction; the company was short of funds; a receiver was appointed and a reorganization effected whereby a bondholders' committee purchased at foreclosure sale, and, jointly with the receiver, reconveyed the property to the company.

Construction was resumed in 1879 and reached the Yellowstone River in Montana in 1880. In 1879 the company began building eastward at Ainsworth in Washington Territory. The road from Carlton, Minnesota, to Ashland on Lake Superior was completed in 1883. Eastward and westward extensions met at a point in Montana in August 1883. The Cascade Branch from Pasco to Tacoma was completed in 1887. The company, by contract with the Oregon Railroad and Navigation Company, obtained the right to use the line of the latter from Wallula to Portland where it connected with the line to Puget Sound. As sections of twenty-five miles were completed, Commissioners were appointed, examined the road, reported favorably, and the construction was accepted by the President.

---

[5] Joint Resolution of May 31, 1870, 16 Stat. 378.

The corporation chartered by Congress operated the road until receivers were appointed in 1893. Pursuant to foreclosure proceedings the Northern Pacific Railway Company acquired title to the railroad, the land grant, and all other property of the original corporation and has since operated the road and obtained patents for millions of acres under the land grants.

The grant of 1864 was of the ten nearest alternate odd-numbered sections of public land, not mineral, on each side of every mile of the line as definitely located, in a state, and of twenty such sections in a territory. This grant was *in praesenti.*[6] The lands thus granted are spoken of as "place lands." They were in two belts each twenty miles wide in states, and forty in territories, parallel to the right of way.

Excepted from the grant were lands reserved, granted, appropriated, pre-empted, or subject to other claims and rights at the date of definite location. These exempted lands are spoken of as "lands lost to the grant." In lieu of such lost lands the Act provided that other lands were to be selected by the company, under the direction of the Secretary of the Interior, from odd-numbered sections not more than ten miles beyond the place lands, on each side of the road. The two ten-mile strips thus defined are spoken of as "the first indemnity belts" or "the first indemnity limits."

The Resolution of May 31, 1870 granted, as respects the additional line authorized between Portland and Puget Sound, place and indemnity lands, as granted for the original line by the Act of 1864. It also authorized what are spoken of as "second indemnity" belts ten miles wide, on either side of the original indemnity limits, in any state or territory in which the company could not obtain the number of sections intended for it by its

---

[6] *St. Paul & Pacific R. Co.* v. *Northern Pacific R. Co.,* 139 U. S. 1, 5.

charter. This additional grant, however, was conditioned that lieu lands in the second indemnity limits might be chosen only in the same state or territory in which place lands were lost to the grant.

Mineral lands are excepted from both grants. In lieu of lands lost because of their mineral character the legislation permits selection of agricultural lands within fifty miles on either side of the right of way. These fifty mile strips are known as "the mineral indemnity belts." Their exterior limits coincide with the exterior limits of the first indemnity belt in territories and lie ten miles beyond the exterior limits of the second indemnity belts in states.

"The ultimate obligation of the Government in respect of the indemnity lands is on the same plane as that respecting the lands in place. The only difference is in the mode of identification. Those in place are identified by filing the map of definite location, and the indemnity lands by selections made in lieu of losses in the place limits." [7]

Since the grant excluded mineral lands and gave agricultural lands in lieu thereof, but made no provision for the determination of the character of the lands, Congress passed an Act of February 26, 1895,[8] which directed that the mineral character of the lands should be ascertained by a classification by commissioners appointed by the President which, when approved by the Secretary of the Interior, should be final except in case of fraud. Such a classification was made, whereby approximately 3,782,377 acres of place lands and more than 1,000,-000 acres of indemnity lands, were ascertained to be mineral.

Between March 1, 1898, and May 15, 1924, 1,103,424 acres in the first indemnity limits, under the 1864 grant,

[7] *Payne* v. *Central Pacific Ry. Co.*, 255 U. S. 228, 236.
[8] 28 Stat. 683.

and 961,992 acres in second indemnity limits of the same grant, were withdrawn and placed in national forests and other Government reservations. During the same period 155,727 acres from the first indemnity limits of the grant of 1870, and 213,001 acres from the second indemnity limits laid down under that grant, were withdrawn for the same purposes. This action was taken, in the main, pursuant to an Act of March 3, 1891.[9]

The company sought to select indemnity lands within the reservations but the Secretary of the Interior would not accept or approve the selections and the company was unable, by litigation, to compel action favorable to it.[10] In 1905, however, the company filed a selection list for over five thousand acres of surveyed lands in a Government forest reserve in Montana. The list was approved and the Secretary of the Interior issued patents. Subsequently, upon discovering that these lands were within the forest reserve, the United States brought suit to cancel the patents. The case reached this court,[11] which held that the Act of 1864, and the Resolution of 1870, embodied an offer that, if the company would construct and operate the railroad, it should receive the granted lands; that this offer had ripened into a contract by the company's acceptance and performance; that the promise of indemnity for granted lands not available to the company was a vested right protected from destruction; that, though the lands in the indemnity belts were open to acquisition by settlers before survey, they were open to selection by the company only after survey; and, finally, that withdrawals of indemnity lands for governmental purposes were invalid unless, at the time of withdrawal, there remained nonmineral lands available for selection sufficient to satisfy prior losses to the company

[9] 26 Stat. 1095, 1103; 16 U. S. C. 471.

[10] *Northern Pacific Ry. Co.* v. *Lane*, 46 App. D. C. 434.

[11] *United States* v. *Northern Pacific Ry. Co.*, 256 U. S. 51.

from the grant. The measure of the grant was held to be the aggregate of the odd-numbered sections within the place limits, subject to certain deductions not here material. Although a stipulation had been filed as to the measure of the grant, the court held that, since the evidence did not disclose that certain necessary deductions from the grant had been made to ascertain the net amount of land to which the company was entitled, the case was not ripe for judgment. Accordingly the cause was remanded for a determination of the alleged deficiency in the grant and for further proceedings dependent upon such determination.

The Department of Agriculture, which was charged with the administration of the forest reserves, realized that if the company's claims as to the deficiency in the grant, with consequent right of selection of withdrawn lands as indemnity, were sustained, much of the land in the forest reserves would be diverted from the purpose intended by their reservation. The Forester of the United States called the situation to the attention of the Secretary of the Interior and suggested that the latter should investigate a number of questions affecting the company's claims. The Land Office, with the coöperation of the company, undertook an adjustment of the grant and a tentative adjustment was prepared. The Forester raised many objections. Ultimately the Secretary of Agriculture, and the Secretary of the Interior, called the situation to the attention of the President and he and they communicated with Congress. As a result, that body adopted a Joint Resolution on June 5, 1924,[12] directing the Secretary of the Interior to withhold approval of any adjustment of the company's land grants and to withhold the issue of further patents; and appointing a Joint Committee to make an investigation of the grants and to report its conclusions and recom-

[12] 43 Stat. 461.

mendations to Congress. This Committee held protracted hearings, at which the Government departments and the company were represented, and presented evidence amounting to over five thousand printed pages.

In April 1929 the Committee rendered its report [13] recommending passage of a bill authorizing the institution of proceedings by the Attorney General to procure "a final and complete determination of the respective rights of the United States and the Northern Pacific Railway Co. to the end that the grants shall be finally adjusted and the interests of the United States and the grantee shall be fully protected." The result was the Act of June 25, 1929.[14] The title indicates that the purpose of the Act was to alter and amend the Act of July 2, 1864, and the Resolution of May 31, 1870; "to declare forfeited to the United States certain claimed rights asserted" by the company; and "to direct the institution and prosecution of proceedings looking to the adjustment of the grant."

The Act retains for the United States, free of claim by the company, and removes from the grant, any lands within the indemnity limits which, on June 5, 1924, were within the boundaries of any national forest or other Government reservation and which, on the date of withdrawals for governmental purposes, would be, or were, available to the company, by indemnity selection or otherwise, in satisfaction of any deficiency; and directs that the company shall have from the United States such compensation, if any, as the courts hold due for the loss of such lands. (§ 1.)

It declares that all unsatisfied indemnity selection rights, if any exist, claimed by the company, are forfeited to the United States. (§ 2.) It reserves the right to amend and repeal the charter act and supplementary

---

[13] S. Rep. No. 5, 71st Cong., 1st Sess.

[14] 46 Stat. 41.

resolution and asserts the adherence of Congress to the original policy with respect to the company's disposi-. tion of granted lands. Right of way lands and those in good faith employed in the operation of the railroad are excluded from the declared forfeiture. (§§ 3, 4.)

It directs the Attorney General to bring suit to remove the cloud of the company's claims upon any lands of the United States; to determine all controversies between the United States and the company, and to obtain a full accounting of what the company may be entitled to recover, and what the United States may be entitled to recover; to find and determine the extent of the performance by the United States, and by the company, of the terms of the granting Acts and what lands, if any, have been patented or certified as a result of fraud, mistake of law or fact, or legislative or administrative misapprehension; and, finally, to determine all questions of law and fact germane to a complete adjudication of the respective rights under the granting act and resolution, and all other questions of law and fact presented to the Committee. (§ 5.)

It lays down, in general terms, the considerations which are to govern in the mutual account to be taken between the United States and the company and empowers the court to render such judgments and decrees as law and equity may require. (§ 6.)

It establishes the venue for the trial of the suit, and for appeal, and provides that a reasonable time shall be fixed by the court within which Congress may adopt appropriate legislation to meet the requirements of the judgment. (§ 7.)

It requires reports to Congress from time to time from the Attorney General as to the decisions rendered in the proceeding. (§ 8.)

It provides for the withholding of the approval of the adjustment of the land grants by the Secretary of the

Interior and for the withholding of patents until the determination of the litigation. (§ 9.)

Pursuant to the Act, the Attorney General caused a bill to be filed; on behalf of the United States, in the District Court for Eastern Washington. The company and the trustees under certain of its mortgages filed answers and motions to dismiss the whole bill and each paragraph. The court referred the motions to a special master. He reported that they should be sustained as to certain paragraphs of the bill. The court overruled exceptions to his report. The case was then again referred to the master before whom testimony was taken upon the issues raised by the answers to those portions of the bill which had not been dismissed. The master reported that the company should be awarded compensation for the loss of the right of indemnity selection in the withdrawn lands, and submitted his calculation of the acreage involved.

The court, after sustaining certain of the plaintiff's exceptions and dismissing almost all of the defendants', found the company entitled to patents for certain lands outside the reserves and to compensation for the loss of 1,453,061 acres of land within them. The court reserved for future decision the contentions of the mortgagees that they are purchasers for value whose rights cannot be affected by the Government's claim and also ascertainment of the amount to be awarded to the company.

At this stage of the litigation Congress adopted the Act of May 22, 1936,[15] authorizing a direct appeal from the decree of the District Court to this court. Pursuant to that statute the present appeals by the United States and the company were taken. As to many of the issues the parties have accepted the decision of the Ris-

---

[15] 49 Stat. 1369.

trict Court. Errors are, however, assigned to the decree below by both the Government and the company.

The Government concedes that the Act of 1929, *supra,* is not a declaration of forfeiture for breach of conditions imposed by the Act of 1864 and the Resolution of 1870, but a reference to the courts of all questions as to performance and breach of the contracts created by the Act and the Resolution, to the end that the respective rights and liabilities of the parties may be determined and enforced. The company asserts that the Act of 1929 is an exercise of the power of eminent domain whereby the company is deprived of further right to select indemnity lands, and is to be paid just compensation for the right so taken. But the company does not deny that, in ascertaining the amount due it, the Government may offset the amount of any claims it may now be entitled to assert by reason of the company's breaches of contract.

The Government urges that the breaches of covenant by the company have been so substantial that it cannot call for further performance by the United States and is, therefore, not entitled to further selection rights or to any money compensation for their abrogation. Reliance is placed upon the following alleged breaches.

1. *The alleged failure of the company to obtain bona fide subscriptions to its stock and payments thereof required by the Act of 1864.*

Section 19 of the Act of 1864 provides that, unless within two years of its approval the company shall obtain bona fide stock subscriptions to the amount of two million dollars, with ten per cent. paid, the Act shall be null and void.

Paragraph VI of the bill alleges that, although within the two years pretended subscriptions and payments were made, the pretended payments were sham and a

fraud upon the corporation and the United States; that the Act thus became void and the company is not entitled to any compensation in the present suit.

The master recommended that the motion to dismiss this paragraph should be granted, and the District Court so ordered.

2. *The alleged failure of the company to perform the condition of the grant that it complete the whole railroad.*

Section 8 of the Act of 1864 provides that "each and every grant, right, and privilege herein are so made and given to, and accepted by, said Northern Pacific Railroad Company, upon and subject to the following conditions, namely: That the said company shall commence the work on said road within two years from the approval of this act by the President, and shall complete not less than fifty miles per year after the second year, and shall construct, equip, furnish, and complete the whole road by the fourth day of July, anno Domini eighteen hundred and seventy-six." The time for the completion of the road was extended by Congress to July 4, 1879. It is undisputed that the company never definitely located or built that portion of its line embracing the two hundred and twenty-five miles between Wallula and Portland. Instead, it made a contract for running rights over the tracks of the Oregon Railway & Navigation Company.

In paragraphs XIV and XXVI of the bill the United States alleges that the road was never completed. The master recommended that the company's motion to dismiss these paragraphs be granted. The court so ordered.

3. *The claim that diversion of funds in the building of branch lines disentitles the company to select further lands.*

Paragraph XIV of the bill alleges that, through various described contracts and transactions, the funds of

the Northern Pacific Railroad Company were used in the building of branch lines which were unjustified and unprofitable and that further funds were, under contract, advanced to such branch lines to keep them in operation. It is alleged that these things were done at a time when the company had not completed its main line from Wallula to Portland. The bill charges that the illegal and fraudulent conduct it describes resulted in the branch lines receiving unconscionable and illegal profits at the cost of the Northern Pacific when the latter's funds should have been used to complete its main line, all in violation of the contract between the United States and the Northern Pacific created by the Act of 1864 and the Resolution of 1870. The master recommended that this paragraph be dismissed in the view that the transactions in question did not disentitle the company to exercise indemnity selection rights in connection with the grant so far as concerns the road actually constructed. The court dismissed the paragraph.

4. *The claim that the company failed to perform its contract by refusing to open lands granted it by the Resolution of 1870 to settlement and pre-emption at $2.50 per acre.*

Section 10 of the Act of 1864 provides that "no mortgage or construction bonds shall ever be issued by said company on said road, or mortgage, or lien made in any way, except by the consent of the congress of the United States."

An additional line was authorized by the Joint Resolution of 1870 and a land grant made therefor. The Resolution empowered the company to issue bonds in aid of construction and equipment, and to "secure the same by mortgage on its property and rights of prop-

erty of all kinds and descriptions, real, personal, and mixed, including its franchise as a corporation." The Resolution further provided "that all lands hereby granted to said company which shall not be sold or disposed of or remain subject to the mortgage by this act authorized, at the expiration of five years after the completion of the entire road, shall be subject to settlement and pre-emption like other lands, at a price to be paid to said company not exceeding two dollars and fifty cents per acre."

Paragraph XIII of the bill refers to these provisions of the Joint Resolution and alleges that among the place lands granted there are many million acres the quantity and description of which are known only to the company, or its predecessor, which should have been opened to settlement and pre-emption whereas they were, subsequent to July 4, 1884, (five years from the date finally fixed for completion of the road), sold at such prices, and on such conditions, as to the company seemed best, and that this was a breach of the company's contract with the United States and defeated the policy of the United States. The master reached the conclusion that the motion to dismiss paragraph XIII should be sustained and the court so ruled.

The Government insists that the Resolution required the company to hold the lands open for settlement, at the price and in parcels as specified, after five years, whether mortgaged or not; that it failed to do so, and sold the lands at higher prices and in larger parcels than the Resolution required, and that its breach of covenant defeats its right to any award. The company contends that the intent of the Resolution was to permit it to mortgage all its property rights; that if, at the expiration of five years from the completion of the road, any of the granted lands were undisposed of, or were

not subject to mortgage, those lands were open to pre-emption; that, whether or not the existence of a mortgage prevented settlement of the lands, after five years, there was no duty on the company to dispose of them to settlers; and that the company has not broken any covenant in respect of the lands in question.

5. *The claim that unauthorized withdrawals of place and indemnity lands preclude any award to the company.*

Section 3 of the Act of 1864 grants place lands "on each side of said railroad line, as said company may adopt," and fixes the date of passage of title to the company as "the time the line of said road is definitely fixed." Section 6 provides that the President shall cause the place lands to be surveyed "after the general route shall be fixed."

Pursuant to preliminary surveys, the Railroad Company filed with the Secretary of the Interior a map showing the general route of the proposed line. Thereupon the Secretary caused place limits to be laid down on either side of the proposed general route and withdrew from sale or entry the odd-numbered sections within those limits. In 1903 this court held that title to the granted place lands did not vest in the company until the filing of a map of definite location and that, consequently, the withdrawal of the lands by the Secretary prior to that time and coterminous with the general route was unauthorized.[16]

After the company had filed its maps of definite location the Secretary mapped the indemnity limits specified by the Act of 1864 and withdrew the lands comprehended within those limits from sale or entry. In 1888 the then Secretary held that land within the indemnity limits was open to pre-emption under the homestead

---

[16] *Nelson* v. *Northern Pacific Ry. Co.*, 188 U. S. 108, 116–117.

laws and that such pre-emption, even before actual survey of the lands, deprived the company of the right to select the lands pre-empted. This view was adopted by this court in 1901.[17]

Paragraph XXXII of the bill recites these facts and alleges that, by virtue of the withdrawals, the Railroad Company and the Railway Company have received benefits, lands, and values to which they were not entitled, to the injury of the United States. The master recommended that the motion to dismiss the paragraph be sustained and the court so decreed.

6. *The claim that the foreclosures and reorganizations of the railroad and its property disentitle the company to select further lands.*

The Resolution of 1870 authorized the railroad company to issue its bonds and secure the same by mortgage on its property of every kind and provided that if the mortgage authorized should at any time be enforced by foreclosure or other legal proceeding, or the mortgaged lands granted by the Resolution, or any of them, should be sold by the mortgage trustees, upon default, "such lands shall be sold at public sale, at places within the States and Territories in which they shall be situate, after not less than sixty days' previous notice, in single sections or subdivisions thereof, to the highest and best bidder . . ."

The bill alleges that two reorganizations occurred,—one in 1875 and the other in 1896. As respects the first, it is charged that, pursuant to court order, the trustees of the mortgage conveyed the mortgaged railroad and property in a block to certain individuals who thereupon retransferred to the railroad company under an arrangement whereby mortgage bondholders received preferred stock in lieu of their bonds, such preferred stock to be

---

[17] *Hewitt* v. *Schultz*, 180 U. S. 139.

redeemed from the proceeds of the sale of the company's lands. With respect to the latter foreclosure it is alleged that the company, after reorganization, created a number of mortgages which were foreclosed and that, in the course of the foreclosure, sales of the mortgaged lands, while made in the respective states and territories where they lay, and although made section by section, were all, by prearrangement, purchased by, or in behalf of, a new company, whereas it was the intent of Congress that they should be so sold as to give individuals an opportunity to acquire them.

Paragraphs IX, X, XI, XII, XVI and XVIII describe the transactions in great detail and charge that what was done was in the teeth of the policy of the United States and to its injury. The master recommended dismissal of these paragraphs and the court adopted his recommendation. The United States insists that what was done constitutes a breach of the company's obligation under the Resolution of 1870 so substantial as to disentitle it to any further performance of the land grants. The company asserts that the reorganization of 1875 involved no sale of the mortgaged lands within the contemplation of the statute but a mere device for reinvesting the company with its lands, freed of the mortgage, and that the foreclosure sales made in the reorganization of 1896 were made in strict and exact accordance with the provisions of the Resolution of 1870.

---

The Government asserts that none of the paragraphs referred to above should have been dismissed. It says that each of the breaches charged was so substantial as to disentitle the company to further performance by the United States. But, in any event, it says that all of them, taken together, certainly require this conclusion.

The company, on the other hand, contends that, as to some of the matters charged, the allegations of the bill do not show any breach, and that, as to others, if a breach is sufficiently alleged it was not such as, in the light of the history of the grants and the performance received by the United States, would disentitle the company to all further performance.

If the Government's position is sound the decree below should be reversed and the cause remanded with instructions to enter a judgment against the company and in favor of the United States.

The justices who heard this case are equally divided in opinion upon these issues. No opinion is expressed upon them, and they are reserved, in view of the fact that our rulings on other issues may be dispositive of the entire controversy.

---

The Government puts forward certain further claims which, if sustained, would preclude any recovery by the company.

7. *The claim that no compensation should have been awarded because unsurveyed public lands were available for selection, and the company failed to show that it would, or could, have selected and obtained all of the withdrawn lands.*

The District Court found that, at March 1, 1898, just prior to the first forest withdrawal, the company had unsatisfied losses of 5,946,664 acres under the 1864 grant and that the total lands available for selection at that date were 1,137,508 acres, leaving a deficiency in the grant of 4,809,156 acres; and the deficiency in the 1870 grant, excluding available land in second indemnity limits, at March 1, 1898, was 593,656 acres, and there has been, ever since, a deficiency in respect of that grant.

In these findings the court computed as lands available for selection only non-mineral, surveyed, vacant land. The company asserts that in this the court was right. The Government insists that vacant unsurveyed lands were "available" as indemnity to the company notwithstanding the concession that, as lands selected must be identified, the company cannot select them until they have been so identified by survey.[18] It says the company failed to show that there were not ample unsurveyed lands within the indemnity limits to set off losses in the place limits at the time of the withdrawals and adds that, inasmuch as homesteaders might, in the interim, obtain prior rights by actual settlement of these unsurveyed lands,[19] it is a matter of pure speculation whether the company would ultimately have obtained adequate indemnity even if unsurveyed lands had not been withdrawn for forest reserves. It further claims that if the court below had treated unsurveyed lands as available for indemnity selection, there would have been no deficiency at the dates of withdrawal.

These contentions cannot be sustained.

Decision turns on the inquiry as to what lands were available to the company for selection at the time of the respective governmental withdrawals.

It is, of course, evident that the company could not select mineral lands as indemnity. It follows that all lands classified as mineral were excluded from selection.

By § 3 of the Act of 1864 it is provided that whenever any of the place lands granted to the company

---

[18] Atlantic & Pacific R. Co., 17 L. D. 313; Northern Pacific R. Co., 20 L. D. 187; *Sawyer* v. *Gray*, 205 F. 160, 163; *Douglass* v. *Rhodes*, 280 F. 230, 231; *Cox* v. *Hart*, 260 U. S. 427, 436.

[19] *Hewitt* v. *Schultz*, 180 U. S. 139; *Southern Pacific R. Co.* v. *Bell*, 183 U. S. 675.

shall have been, prior to the time of definite location of the road, "granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, other lands shall *be selected by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, . . .*"

The fact that the lands in the indemnity limits are, before survey, subject to be taken by pre-emptors and settlers, and thus ultimate satisfaction of the railroad company may be defeated, does not justify the Government itself in reserving lands contained within those limits and thus rendering impossible the company's obtaining them. This was definitely held in the *Forest Reserve Case.*[20]

Much was said in argument as to the meaning of the phrase "lands available as indemnity" as used in that case. It seems clear that unsurveyed lands are not available to the company under the Act of 1864. It will be observed that the company must select indemnity lands under the direction of the Secretary of the Interior. That officer has invariably ruled that no selection can be made or approved until the lands in question are surveyed.[21]

This ruling was necessitated by the very terms of the Act of 1864, which requires selection of alternate sections designated by odd numbers. Obviously, until surveyed, no odd-numbered sections could exist. Unsurveyed lands are not public lands.[22]

---

[20] 256 U. S. 51, 66, 67.

[21] Atlantic & Pacific R. Co., 17 L. D. 313; Northern Pacific R. Co., 20 L. D. 187, 190.

[22] *Hewitt* v. *Schultz,* 180 U. S. 139, 152; *United States* v. *Montana Lumber & Mfg. Co.,* 196 U. S. 573, 578; *United States* v. *Morrison,* 240 U. S. 192, 200; *Cox* v. *Hart,* 260 U. S. 427; *Sawyer* v. *Gray,* 205 F. 160, 163; *Douglass* v. *Rhodes,* 280 F. 230, 231; *Northern Pacific Ry. Co.* v. *Lane,* 46 App. D. C. 434.

The decision in the *Forest Reserve Case, supra,* did not suggest any different view. The allegation of deficiency in indemnity lands in that case, found in the stipulation of the parties, was that the lands were those odd-numbered sections which the defendant was entitled to select under the regulations of the Land Department. This could only mean, and the decision could only have gone upon the view that it meant, that the surveyed lands within the indemnity limits were deficient to meet the selection rights of the railroad company. The case is not an authority, as the Government contends, for the proposition that unsurveyed vacant lands within the indemnity limits are to be considered as available to the company in ascertaining whether the Government has reserved to itself lands as to which the company has selection rights. Under the doctrine of the *Forest Reserve Case* the challenged withdrawals for forest and other governmental purposes left the indemnity lands available to the company deficient to satisfy its rights of selection.

The holding was that the withdrawals were void and the company's rights remained as if the withdrawals had never been made. If and when any of the withdrawn lands were surveyed the company was entitled to select them, as it did in the *Forest Reserve Case.*

It would appear, however, that the Government's contention is moot as respects all but 23,364 acres of lands in Idaho second indemnity limits for which the company was awarded compensation by the District Court's decree. If unsurveyed vacant lands remaining within the indemnity limits after a government withdrawal are to be treated as available to the company for selection, then the grant was not deficient as respects second indemnity limits in Idaho and the company should not have been awarded compensation for the acreage mentioned.

As respects withdrawals from first indemnity limits of the 1864 grant, and withdrawals from the limits of the 1870 grant, it appears to be undisputed that, other contentions of the Government, such as that with respect to the noncompletion of the entire road, being laid to one side, the withdrawals left the grants deficient even though unsurveyed lands remaining within the limits after the withdrawals be counted as available to the company. And the same conclusion would seem to be required respecting lands within the second indemnity limits in Montana with the exception of 4004.38 acres withdrawn on July 14, 1899.

Thus the issue becomes, to a large extent, moot but, as respects approximately 30,000 acres above referred to, we think what has been said on the subject of the availability of unsurveyed lands sustains the decree of the District Court.

The Government, however, argues that even though the withdrawals for governmental purposes created such a deficiency of lands available for selection that, to satisfy the grant, the company would have been compelled to select lands within the withdrawn reserves, nevertheless, in order to obtain indemnity for the deficiency so created, the company is bound to prove that it would have selected lands within the reserves, and what lands it would have selected, before it can claim compensation from the Government for the deprivation of its right to select. A majority of the justices who heard the case think the position is untenable.

Under the ruling in the *Forest Reserve Case* it was the obligation of the Government to refrain from any action which would deprive the company of its right of selection in accordance with the terms of the grant. When the United States withdrew the lands for forest and other reserves it signified its purpose to retain them for its own use and not to allow the company or anyone

else to obtain them, any law or contract to the contrary notwithstanding. We think the company's right of selection, to the extent of the deficiency in the grant, remained available as to the withdrawn lands, provided the lands selected were such as are defined in the grant. The Government's contention that no one can say how soon the lands would have been surveyed and selected if they had not been withdrawn and reserved, or, if they had remained unsurveyed and not withdrawn, what areas would have been taken up by settlers and pre-emptors, does not avail to abrogate or qualify the company's right to exercise its privilege of selection not-withstanding the withdrawals. Moreover, the argument ignores the repeal of the pre-emption laws by the Act of March 3, 1891.[23]

8. *The claim that the company should be charged with 13,300,000 acres wrongfully received because lying within Indian reservations.*

Paragraph XXIX of the bill alleges that by treaties of September 17, 1851, and October 17, 1855,[24] the United States "reserved" certain lands for Indian tribes. The paragraph alleges that the place and indemnity belts established by the Act of 1864 crossed certain of the lands reserved by the treaties, and that, by mistake and without lawful authority, the company received from the United States lands comprised in the reservations amounting to about 12,000,000 acres in place and first indemnity limits and 1,300,000 acres in second indemnity limits; that for all of them it had obtained patents to which it was not entitled, as it should have known.

In accordance with the master's recommendation, the court below sustained the motion to dismiss paragraph XXIX on the ground that the lands in question were

[23] C. 561, § 4, 26 Stat. 1097.
[24] IV Kappler, 1065; 11 Stat. 657.

granted to the company by the Act of 1864 and the Resolution of 1870. We think the court was right.

By an Act of June 30, 1834,[25] all lands lying west of the Mississippi River, not within the States of Missouri and Louisiana or the Territory of Arkansas, were designated as Indian country. The fee of all this territory was in the United States, subject to the Indian right of occupancy. The treaties of 1851 and 1855 did not alter the status of the lands described in them. The purpose of those treaties was to establish peace and amity between warring Indian tribes *inter sese* and between the tribes and the United States. To this end the country or territory of each tribe was described and the tribes agreed to respect the boundaries named in the treaties. No alteration in the status of the lands had occurred up to the date of definite location of the Northern Pacific's line. About seven hundred miles of the railroad traversed the area embraced in the treaties.

By § 2 of the Act of 1864 it was provided that "The United States shall extinguish, as rapidly as may be consistent with public policy and the welfare of the said Indians, the Indian titles to all lands falling under the operation of this act, and acquired in the donation to the [road] named in this bill." The Government now contends that this section is inapplicable to any but right-of-way lands lying within the areas described by the treaties. The contention was not made or considered below, and we think, if it were open here, the plain language of the section renders it untenable.

Section 3 limits the land grant to lands as to which the United States "have full title, not reserved, sold, granted, or otherwise appropriated, and free from preemption, or other claims or rights, at the time the line of said road is definitely fixed, . . ." The Government contends that this section excludes lands embraced

[25] 4 Stat. 729.

within the treaty limits for the reason that the treaties "reserve" all the lands described in them for the signatory Indian tribes. We think the contention is unsound.

As we have noted, the treaties did not create technical reservations as have many other treaties and acts of Congress. They did not set aside a defined territory for the exclusive use of a tribe nor contain the usual provisions for an Indian Agent for schools, assistance in farming operations, etc. The country described in the Treaty of 1851 amounts to one hundred and sixty-three million acres, and that described in the Treaty of 1855 to thirty-seven million acres. In the case of one of the tribes, if the treaty were considered to create a technical reservation it would have allotted to each man, woman, and child in the tribe more than eighteen square miles.

The Department of the Interior, as is evidenced by the patents issued, has consistently treated the lands in question as included in the grant. This court has repeatedly passed upon the question; has held the lands were Indian country, subject only to the Indians' right of occupancy; were within the grant made by the Act of 1864, and that, by § 2 of the Act, the United States assumed the obligation of extinguishing the Indian title in favor of the company.[26]

---

We come now to the contentions of the Government which go to the quantum of the award.

9. *The claim that the company should be charged with approximately 1,000,000 acres received as the result of adoption of an unnecessarily circuitous route.*

Section 1 of the Act of 1864 empowered the company to locate and construct a continuous railroad line from

---

[26] *Beecher* v. *Wetherby,* 95 U. S. 517; *Buttz* v. *Northern Pacific Railroad,* 119 U. S. 55; *Bardon* v. *Northern Pacific R. Co.,* 145 U. S.

**350**

a point on Lake Superior "westerly by the most eligible railroad route, as shall be determined by said company, . . . to some point on Puget's Sound, with a branch, via the valley of the Columbia River, to a point at or near Portland, . . ." The Resolution of 1870 authorized the company to construct its main line to a point on Puget Sound via the valley of the Columbia River, with the right to locate its branch from a point on the main line, across the Cascade Mountains, to Puget Sound.

Paragraph XXVI alleged that the company was required to construct its railroad to the western terminus upon the most direct and practicable line without unnecessary deviations but that, instead of doing so, the company built the road from Lind, Washington, to Ellensburg, Washington, by an unnecessarily circuitous route southwestward to Pasco on the Columbia River and thence northwestward via the valley of the Yakima, whereas it could have constructed the line nearly due westward from Lind to Ellensburg and have saved about eighty-two miles; that, by reason of this unnecessary circuity, approximately one million, four hundred thousand acres were added to the lands within the limits described in the grant over and above the amount which would have been included had the more direct route been followed. The allegations of the paragraph are that, after filing general route maps, the company ultimately filed definite maps of location and thereupon the Department of the Interior surveyed and patented to it lands lying along the line; that this was an error as the Department should have refused to patent place lands or allow selection of indemnity lands coterminous with the circuitous route. The paragraph contains no averment that the route was selected by the company fraud-

535, 542; *Missouri, K. & T. Ry. Co.* v. *Roberts,* 152 U. S. 114, 117; *Clairmont* v. *United States,* 225 U. S. 551, 556

ulently in order to obtain additional lands or that it was not in good faith thought to be the most eligible route. The paragraph refers to the fact that subsequently the Chicago, Milwaukee and St. Paul Railway located its line from Lind to Ellensburg by the more direct route. The master recommended that the motion to dismiss the paragraph be sustained and the court so ordered. We think there was no error in this disposition of the matter.

The Joint Resolution of 1870 called for the main line to run via the valley of the Columbia River to Puget Sound with a branch line from a convenient point on the main line across the Cascade Mountains to Puget Sound. In pursuance of this requirement the company filed a map of definite location and constructed its route between Spokane and Wallula on the Columbia River. At that point it was able to make a connection with the Oregon Railway & Navigation Company. In 1880 it, therefore, entered into a contract for running rights over the line of that railroad and has used its line for traffic into Portland. It was natural, in this situation, to lay out the authorized branch line over the Cascade Mountains from the main line at Pasco. Maps of the line from Pasco to Tacoma were approved by the Secretary of the Interior between June 1883 and December 1884. Inspection reports in 1879 and 1880, made to the Secretary of the Interior, show that the Department was familiar with the line the company was building.

On March 3, 1893, Congress ratified an agreement for the payment to the Yakima Indians for right of way through their reservation provided the company should, within sixty days, pay the necessary money therefor into the Treasury of the United States.[27] This action shows that Congress was fully informed of the adopted route and coöperated in making its construction feasible.

---

[27] Act of March 3, 1893, c. 209, 27 Stat. 612, 631.

The master and the court below judicially noticed that the route via the Yakima valley was a much more advantageous one in respect of the country traversed, and the probable available traffic, than the more direct route between Lind and Ellensburg. The total population along the latter is said to be less than a thousand persons and the traffic originating thereon practically nil. On the other hand, the Yakima valley is one of the most fertile and productive agricultural sections in the Northwest.

The circuity is not such as to be an obvious evasion of the terms of the grant, and in the absence of any charge of fraud, it must be taken that the directors of the company considered the line laid out the most eligible one. We think the allegations of the paragraph do not support the contention that the company illegally acquired place and indemnity lands contiguous to this portion of its line.

10. *The claim that the company should have been charged with 1,198,000 acres received as indemnity in the second indemnity belt in Montana and should not have been awarded compensation for 170,000 acres in the same belt.*

Under the Act of 1864 losses of land in the place limits could be supplied only in the first and the mineral indemnity limits. The Resolution of 1870 added a second indemnity belt in which selections could be made only for losses in the same state or territory occurring through reservation, pre-emption, or other disposition subsequent to the passage of the Act of 1864.

As has been stated under heading 8, *supra,* the Land Office properly treated the lands within the boundaries described by the treaty of 1851 [28] as available under the grant. By the Crow Treaty of 1868 [29] a distinct and

---

[28] *Supra,* p. 346.

[29] Treaty of May 7, 1868, 15 Stat. 649.

exclusive reservation for that tribe was carved out of the larger territory designated in the earlier days as the Crow country. The Land Office treated the lands thus specifically reserved as lost to the grant and permitted indemnity selections from the second indemnity belt in Montana, in which State the loss occurred.

It appears that, by virtue of withdrawals chiefly for forest reserves in Montana, the company has been deprived of the right to select about 170,000 acres of lieu lands, about 64,000 acres of which losses were due to the creation of the Crow Reservation. In its computation of the lands for which the company was entitled to indemnity and compensation in this suit the court below included this entire acreage.

The Government contends that the court should have charged the company with the indemnity lands received in second indemnity limits in Montana due to alleged losses from the creation of the Crow Reservation and that it should not have awarded any further compensation for the loss of selection rights in that belt resulting from the creation of the Crow Reservation, or otherwise, as the company had already received more than was proper. We think the position cannot be maintained.

As shown under heading 8, *supra,* no lands were removed from the operation of the grant by the Treaties of 1851 and 1855. On the other hand the creation of the Crow Reservation—a typical Indian reservation—in 1868, removed the lands in that reservation from the grant within the intent and meaning of the Act of 1864, as supplemented by the Joint Resolution of 1870, and conferred the right to indemnity selections from the second indemnity belt within the same state.

11. *The credit to the company for lands within the Northern Cheyenne Indian Reservation.*

The court below, in its award, treated the company as entitled to select indemnity lands in first and second

indemnity limits where these limits lay within the Northern Cheyenne Indian Reservation in Montana. The area in question was part of the Crow country recognized by the Treaty of September 17, 1851.[30] When, in 1868, the Crow Reservation was created, the Crow nation ceded all its right and title in other lands embraced within the treaty area to the United States. By an Executive Order of March 19, 1900, the lands in question became part of the Northern Cheyenne Reservation. This action was confirmed by Congress June 3, 1926,[31] which declared that the lands were the property of the Northern Cheyennes, authorized allotments, etc.

The Government contends that these lands were not, on June 5, 1924—the pivotal date mentioned in the Act of June 25, 1929—"embraced within the exterior boundaries of any national forest or other Government reservation."

We think that under the terms of the Act these lands had been withdrawn as a "Government reservation" and for "governmental purposes"; and the Act which authorized this suit contemplated that compensation should be awarded for lands so withdrawn, which, but for the withdrawal, would have been available to the company as indemnity.

12. *The award for land within the reservations on which homesteaders filed prior to June 5, 1924, and for which they received patents after June 5, 1924.*

After the withdrawals had been made homesteaders filed on certain of the lands within the forest reserves. These filings were prior to June 5, 1924. Subsequent to that date patents were issued under the forest homestead laws. The court below, we think, properly treated these

[30] *Supra,* Note 24.
[31] c. 459, 44 Stat. 690.

lands as having been available for indemnity selection by the company at the date of withdrawal and awarded the company compensation for the abrogation of its right to select them. The Government asserts that this was error, in the view that the Act of 1929 awarded compensation only for those lands which would be, or were, available for selection on June 5, 1924. The Act, however, does not so provide. It awards indemnity for lands which, on June 5, 1924, were embraced in any reservation, and "which, in the event of a deficiency in the said land grants to the Northern Pacific Railroad Company *upon the dates of the withdrawals* of the said indemnity lands for governmental purposes, *would be, or were,*" available for selection.

13. *The claim that, as to more than a million acres, the award rests upon a fraudulent mineral classification which will not support indemnity selection rights.*

Section 3 of the Act of 1864, granting odd-numbered sections, excluded mineral lands from the grant. The section provides that iron or coal lands are not to be classed as mineral. In lieu of mineral lands the company is given the right to select a like quantity of "unoccupied and unappropriated agricultural lands, in odd numbered sections, nearest to the line of said road and within fifty miles thereof, . . ."

One of the contentions strongly pressed by the Department of Agriculture before the Joint Committee acting under the Resolution of June 5, 1924, was that, due to the company's fraud, great quantities of place lands had been improperly classified as mineral, with the result that the company had been allowed to select, and had received patents for, over a million acres of land in lieu of those so classified. The company resisted this contention.

By the Act of June 25, 1929, this matter was remitted to the courts for adjudication. Section 5 directs that in the judicial proceedings contemplated there shall be presented, and the court shall consider, make findings relating to, and determine, to what extent the terms, conditions and covenants of the granting acts have been performed by the United States and the company, including the question what lands, if any, have been wrongfully or erroneously patented or certified as the result of fraud. Section 6 requires that, in fixing the amount of compensation to be received by the company on account of the retention by the United States of indemnity lands for national forests or Government reserves, the court shall determine what quantities in lands or values the company and its predecessors have received as a result of fraud and that such excess lands and values, if any, shall be charged against the company in the judgment of the court.

Paragraph XXVIII of the complaint refers to the Act of February 26, 1895,[32] providing for the examination and classification, as mineral or nonmineral, of place and indemnity lands within four land districts in Idaho and Montana; recites the appointment and functioning of the Commissions authorized by the Act; alleges that the Commissioners, undertook to classify approximately eleven million five hundred thousand acres of land, and pretended to classify the same; filed their reports which, with minor exceptions, were approved by the Secretary of the Interior; asserts that 3,782,377 acres, more or less, were classified as mineral, and that the company, and its predecessor in interest, made mineral lieu selections totaling 1,330,762 acres, more or less, and received patents therefor; alleges that the company is claiming additional indemnity lands of approximately 2,451,615 acres

---

[32] *Supra*, Note 8.

in lieu of lands classified as mineral; and charges that the company, and its predecessor, were guilty of fraudulent and collusive practices whereby the Commissioners were persuaded to classify, as mineral, lands of little value, so that the railroad could select more valuable lands in lieu thereof, and that the lands so selected and patented to the company were of a value in excess of the entire 3,782,377 acres, more or less, of lands fraudulently classified as mineral.

The company moved to dismiss the paragraph and in its answer denied the allegations. The master recommended that the motion be sustained and the court so ordered. In this we think there was error.

The master, after considering the facts set out, and matters of which he took judicial notice, stated that he would have no difficulty in overruling the motion to dismiss had it not been for the position taken by the Government in argument. The master states that a goodly portion of the nearly four million acres classified as mineral consisted of lands within the forest reserves, which by the Act of June 25, 1929, the Government signified its intention to retain, that still other lands so classified had been patented to claimants as mineral claims, and that the Government had sold much valuable timber from still other of such lands. The master says that in the light of these facts he inquired of counsel whether the Government desired a reclassification by reason of the alleged fraud and that the reply was in the negative. He reports that counsel contended the Government's pleading was meant to meet and defeat the company's claim, on the theory that, as to the lands classified as mineral and the claims to lieu lands therefor, the company must be treated as a plaintiff, and, as Paragraph XXVIII disclosed that the company did not have clean hands, it could not maintain its claim. The master overruled this contention, holding that the com-

pany was, in this case, a defendant and that the doctrine of clean hands did not apply to a defendant in equity.

Whatever gloss Government counsel may have put upon the paragraph, we think the master and the court below were bound to give full effect to the pleading and that the master was right in his original view that the facts set up, and the issues made by the answer, required a trial; and, if the Government succeeds in maintaining the truth of its allegations, the company should be charged with lands or values obtained as mineral indemnity through the fraud of its agents and their collusion with the Commissioners.

Although it is alleged, and the master found, that it was impossible in the time allowed by Congress for the Commissioners to make such a survey and classification as the legislation contemplated, we think the reports and the Secretary's approval and acceptance thereof, create a prima facie showing in favor of the classification and the company's selection of indemnity lands.

The United States pleaded the fraud which it says renders the classification, and the actions consequent upon it, a nullity. We think it necessarily has the burden of proof to sustain its pleading. It is not barred by laches or estoppel from asserting and proving the alleged fraud, and from having the company charged with the lands or values received as a result of it.

The case must go back for a trial of the issues made by paragraph XXVIII of the complaint and the answer thereto. It may be that on the trial the Government's evidence will prove fraud on the part of the company of such a character and extent as would disentitle the latter to any award even though the fraud does not extend to an acreage equal in extent to that of the selection rights taken away by the Act of 1929.

14. *The meaning of the phrase "agricultural lands" in the provision for selection in lieu of excepted mineral lands.*

In computing the deficiency of lands available for indemnity selection the District Court included the nearly

two million acres of mineral losses as to which indemnity selection had not been made at the time of the withdrawals and treated the withdrawn lands as available for selection in respect of mineral losses. The Government insists that this was error because much of the withdrawn land is not agricultural and is not, therefore, available as indemnity for mineral losses. The company, on the other hand, asserts that in the granting Act the word "agricultural" is not used in its ordinary sense of tillable or cultivable but as meaning merely lands not mineral. It bases this contention largely upon the alleged administrative construction and practice of the Department of the Interior which, so it claims, has treated the word "agricultural" as a term of classification and not one of strict definition.[33] This was the view taken by the master and the District Court.

Section 3 of the Act of 1864, which contains the grant to the railroad, employs three descriptions of public lands. The place land granted is denominated "public land, not mineral"; the lieu lands which may be selected to make up losses in the place lands are referred to as "other lands"; the mineral lieu lands are designated as "unoccupied and unappropriated agricultural lands."

The Act seems to have served as a model for other railroad grants made shortly thereafter. Section 3 of an Act of July 27, 1866,[34] which incorporated and granted lands to the Atlantic and Pacific Railroad Company, is

---

[33] It is true that in administration of the grant the Land Office approved selections upon affidavit merely that the chosen lands were "non-mineral"; but apparently the question whether that phrase was synonymous with "agricultural" was not raised or considered. We think the administrative practice, therefore, does not strengthen the company's argument. Moreover, Congress has not approved the practice, but, on the contrary, has directed that errors in the administration of the grant shall be corrected by the court's decree.

[34] 14 Stat. 292, 294.

in the same words except that the mineral indemnity is limited to a distance of twenty miles from the line. Section 9 of an Act of March 3, 1871,[35] incorporating and granting lands to the Texas Pacific Railroad Company, employs the same phraseology.

The granting clause of the Act of 1864 differed from those theretofore commonly used. In earlier acts indemnity selections were required to be of lands nearest the line. By the Act of 1864 lands in lieu of place lands previously sold, or otherwise disposed of, might be selected from land anywhere within the indemnity belt. In the mineral indemnity provision, however, Congress reverted to the earlier practice of requiring that agricultural lands nearest to the line, but within an unusually wide belt of fifty miles on either side, should be selected. It seems obvious that this provision was inserted in the knowledge that the mountainous Western country would afford less opportunity to obtain good lands by indemnity selection than the more level farming country to the East.

It is also to be noted that the bill as it passed the House omitted a provision found in bills earlier introduced in aid of railroads in the far West, requiring that the lieu lands for mineral losses should not only be those nearest the line, but "nearest the line of the road through said mineral lands . . ."[36] In the Senate the grant of mineral indemnity was stricken out and mineral lands were defined to exclude coal and iron.[37] The bill passed the Senate in this form and was sent to a Conference Committee.[38] The measure came from the Conference Committee in the form in which it finally passed. The

[35] 16 Stat. 573, 576.

[36] Cf. S. 65, 35th Cong., 1st Sess.; H. R. 411, 35th Cong., 1st Sess.

[37] Cong. Globe, 38th Cong., 1st Sess. 3290.

[38] Cong. Globe, 38th Cong., 1st Sess. 3459.

Act thus permitted a selection of agricultural lieu lands not only in the territory adjacent to the mineral place lands but within fifty miles on either side of the right of way anywhere along the entire route of the road. It has consistently been so construed and the company has been allowed to select, as mineral indemnity, lands not more than fifty miles from its right of way opposite any part of the road and in any state traversed by the line.[39]

The Government contends that "agricultural" means "presently tillable" or "presently fit for the plough." We agree, however, with the master and the court below that the words "mineral" and "agricultural" as used in the Act are not to be read strictly as defined by the dictionary. Mineral lands, as the phrase has been applied in the administration of public lands, embrace not only those which the lexicon defines as mineral, but, in addition, such as are valuable for deposits of marble, slate, petroleum, asphaltum, and even guano. Likewise, in the administration of pre-emption and homestead legislation, the terms "agricultural" and "cultivation" have been given a liberal construction. It appears from the record, and from the evidence before the Joint Congressional Committee, that pre-emptors or homesteaders, under the acts requiring settlement and cultivation as a prerequisite to a patent, have been allowed to take up forests, grazing land, and, in fact, all types of land which, in good faith, were sought for a home, provided the lands could, by the settler's effort, be made habitable

[39] Op. A. G. 498, 41 L. D. 571; Sessey v. Northern Pacific Ry. Co., 43 L. D. 302. The practice of the Land Office has been uniform in permitting selection of mineral lieu lands in any state irrespective of the state of loss. The same principle has governed the right of selection of first indemnity lands for losses other than mineral. 19 Op. A. G. 88, 94; Northern Pacific R. Co., 20 L. D. 187; Northern Pacific R. Co. v. Shepherdson, 24 L. D. 417; Hagen v. Northern Pacific R. Co., 26 L. D. 312.

and used as a farm home. This has been true in spite of the fact that the applicable acts of Congress have required cultivation as a prerequisite to acquisition by the pre-emptor or homesteader.[40]

Under the administrative practice, although lands containing timber could be taken for homes in the public land states, a certain portion of the lands had to be cleared preliminary to cultivation. But, the pre-emptor or homesteader has not been permitted to take up lands valuable only for timber or for stone or for some other use, which could not be rendered cultivable or usable in a broad sense for farming, by clearing or other work done thereon. Pursuant to legislation enacted years after the grants to the company, lands unfit for a farm home could be acquired.[41]

It seems to us that inasmuch as the railroad company could not take other mineral lands in lieu of mineral place lands lost to the grant and, if it were confined to non-mineral lands, contiguous to the lost mineral lands, it would probably receive lands then considered of little or no value, Congress, by the use of the term "agricultural," and by granting the right to select the lieu lands anywhere along the line, intended to give the company the privilege of taking more valuable lands than those wild forest lands contiguous to the mineral place lands in the Western mountain regions.

The truth seems to be that, in extending this privilege to select more valuable lands, Congress did not have in mind a distinction between "non-mineral" and "agricul-

---

[40] Act of June 19, 1834, c. 54, 4 Stat. 678; Act of June 22, 1838, c. 119, 5 Stat. 251; Act of August 4, 1842, c. 122, 5 Stat. 502; Act of March 3, 1843, c. 86, 5 Stat. 619, 621; Act of May 20, 1862, c. 75, 12 Stat. 392; R. S. § 2291, 43 U. S. C. § 164.

[41] Timber and Stone Act, June 3, 1878, c. 151, 20 Stat. 89; Desert Land Act, March 3, 1877, c. 107, 19 Stat. 377. The latter Act excluded both mineral and forest lands from its operation.

tural" lands, in the sense that the company must select the more valuable agricultural lands and refrain from taking less valuable lands non-mineral but not suscepti- ble of cultivation. As the master well says, at the time of the grant agricultural lands in states eastward of the Rocky Mountains were far more valuable than the rough mountain lands farther to the west. It is reasonable to suppose that, at that time, neither Congress nor the company contemplated the selection of unusable moun- tain lands rather than lands ultimately available for ag- riculture. Nevertheless, we are bound to attribute some meaning to the language Congress employed. It is ob- vious that, by the use of the word "agricultural," the company was precluded from selecting other mineral lands in lieu of mineral lands lost in the place limits. With mineral lands thus excluded, we think the word "agricultural" is to be interpreted in the light of exist- ing legislation and conditions.

We are of the view that the word "agricultural" was not, therefore, used as synonymous with "non-mineral" but as synonymous with "land subject to be taken by pre-emptors or homesteaders under the public land laws." It is conceded that much of the land in the forest reserves which the company claims the right to select as mineral indemnity is not such as could have been acquired by individuals under the land laws in force at the time of the grant.

We have already noted that until the public lands were surveyed the company could not make selections and that, in the meantime, unsurveyed lands might be taken, under the pre-emption and homestead laws, to the company's loss or detriment. No doubt if the rail- road had been more promptly built, and if the company had been more active in paying for and procuring sur- veys, good lands in various states within the mineral indemnity belt would have been available for selection.

These, however, were taken up and removed from the company's right of selection, with the result that the existing deficiency in the grant must be satisfied, if at all, by selections of lands now in the forest reserves. But, for whatever reason, the company has lost the right to select the better lands mentioned, and we cannot re-write the statute to confer upon it the privilege of taking lands of a different character than those specified.

We conclude that, while the company had, at the time of withdrawal, the right of selection of any lands which, under the existing practice of the Land Office, a settler could have taken under the pre-emption or homestead laws, it may not take lands valuable solely for timber or for other uses which would not justify pre-emption or homestead settlement under the land laws as contemporaneously understood and administered. The company's right of selection in the forest reserves is limited to such land as would, under the practice of the Land Office, have been available to individuals under the public land laws either for clearing and subsequent cultivation, or for grazing, or for any other purpose commonly classified by the Land Office as coming within the pre-emption and homestead laws.

Since the court below has accorded the company a much broader right of selection, its decree must be reversed and the cause must be remanded for ascertainment of the company's selection rights as of the dates of the withdrawals, in accordance with the views herein expressed.

15. *The claim that the United States is liable to account to the Railway Company only for the ascertained deficiency at the time of withdrawal.*

In its brief upon reargument the Government takes the position that even if the withdrawals left the grant deficient in lands lying in the second indemnity limits, the United States is liable to account to the Railway

Company only for the amount of such deficiency. The District Court held that if a given withdrawal had the effect of leaving within the indemnity limits an insufficient acreage to satisfy the selection rights of the company the withdrawal was a breach of the Government's obligation because thereby the Government disenabled itself to carry out that obligation. The consequence which the District Court attached to such action on the part of the Government was that the lands withdrawn were, notwithstanding the withdrawal, still open to selection by the company if and when surveyed. The court below thought that, as the company was entitled, under the terms of the grant, to exercise its selection rights with respect to the withdrawn lands in these circumstances, the Act of 1929 contemplated that it should be compensated for the deprivation of that right.

We think that the District Court was right and that the Government's position that it is liable to account only for any deficiency in the vacant lands at the time of withdrawal is not in accord with the granting act of 1864. The *Forest Reserve Case, supra,* supports the decision below. It is clearly there held that if, by the Government's own act in withdrawing lands from the indemnity limits, it leaves insufficient vacant land available for selection the company thereby becomes entitled to select lands within the indemnity limits. That is exactly what was done by the company which brought about the litigation in the *Forest Reserve Case.* The decision is clear to the effect that, assuming the grant was deficient (which was the matter the court could not determine on the record then presented), the company was entitled to select lands within the reserve.

16. *The claim that subsequent restorations of withdrawn lands defeat the company's right of selection of lands within the Governmental withdrawals.*

What has just been said requires denial of the Government's contention that where withdrawn lands were

subsequently restored to the public domain, in an amount sufficient to make up the deficiency created by the original withdrawal, the company's claim to choose lands within the withdrawal areas was thereby defeated.

Under the Act of 1929 the company's right to compensation depends upon the availability of lands on the dates of withdrawals for governmental purposes. This provision of the Act of 1929 is, we think, in strict accordance with the purpose and intent of the granting act and resolution. If, by the withdrawals, the Government disenabled itself to comply with its obligations to the company, the withdrawals were unauthorized and the company's right attached to the withdrawn lands equally with the vacant lands remaining in the indemnity limits.

**17.** *The illegal withdrawals of place and indemnity lands.*

As has been noted under heading 5, *supra,* the action of the Department of the Interior in prematurely withdrawing lands in the place and indemnity limits from settlement and pre-emption is claimed to have the effect of denying the company any further rights under the grants.

The further argument is made that, in any event, the company is liable to the Government for damages consequent upon its receiving lands which, if it had not been for the improvident withdrawals, would have gone to settlers and pre-emptors. The claim is that the court below should have permitted the Government to prove any damages it might be able to show as a result of this incorrect administration of the grant. A majority of the Court is of the opinion that a good ground for a credit in favor of the United States against the company is set up by paragraph XXXII of the bill and that

this paragraph is not, in this aspect, subject to the motion to strike.

The paragraph sets up the disadvantages to the Government of the action of the Secretary of the Interior in withdrawing lands prematurely; that as a consequence the company and its predecessor secured benefits, lands and values to which they were not entitled, to the injury of the United States.

The majority of the Court thinks that section six of the Act of 1929 requires a charge against the company for sums received in lands or values in excess of that to which it was rightfully entitled through mistake of law or fact, or through misapprehension as to the proper construction of said grants, or as a result of fraud, or otherwise.

The proof of these alleged advantages gained or losses suffered may be difficult. This is for development at the hearing. The proof, however, must be of financial detriment to the United States or of financial benefit to the company.

18. *The company's failure to open lands granted by the Resolution of 1870 to settlement and pre-emption.*

The company's alleged breach in this aspect as a defense to the company's entire claim is mentioned in heading 4, *supra.*

The bill alleges, in paragraph XIII, the company's failure to open the granted lands to settlement and preemption was a breach of its contract and "in defeat of the policy of the United States with respect to the disposition of its public domain, . . ." In paragraph XLII the court is asked to determine the extent to which the company has failed to comply with the obligation imposed by the Joint Resolution pertaining to the disposition of the lands by settlement and pre-emption and to decree that the company now perform its cove-

nant to the extent this is possible and, where it is found impossible for the company to perform, the plaintiff have such relief as the court may deem proper; and further that the court decree that any and all moneys received by the company from or by reason of the granted lands after the breach of its covenant be declared to have been received by the company in trust for the use and benefit of the United States and that the plaintiff be awarded judgment for the amount of such moneys. The prayer is, therefore, in the alternative for damages or for an accounting, as upon a constructive trust.

We hold, contrary to the Government's assertion, that the proviso of the Resolution of 1870, requiring that the lands be opened by the company to settlement and pre-emption applies only to the additional lands granted by that Resolution and not to lands acquired under the grant of 1864.[42] We hold further that the company was not a trustee of the lands for the United States either in its own right or in behalf of possible settlers.[43] It results that the Government cannot call upon the company to account as a trustee for the proceeds of sale of the lands.

A majority of the justices who heard this case are of opinion that the proviso of the Resolution of 1870 required the company to open the lands granted by the Resolution to pre-emption and settlement at the expiration of five years from the completion of the entire road in 1887, whether the lands were then subject to mortgage or not; that its failure so to do was a breach of its contract with the United States and that the Government

---

[42] The legislative history is convincing: see Cong. Globe, 41st Cong., 2d Sess., pp. 2480–85; 2569–84.

[43] Compare *Oregon & California R. Co.* v. *United States,* 238 U. S. 393, 431–436.

is entitled, if it can, to prove any damage to it, or advantage to the company, which resulted from this breach of contract. In this view the court below should not have dismissed paragraph XIII of the bill and that paragraph should be reinstated for the purpose of permitting the Government to prove damages and proof should be submitted thereunder to that end.

19. *The claim that the decree below in directing patents to issue for 428,986.68 acres of land outside the reserves was erroneous to the extent of 44,838.60 acres of indemnity lands.*

In its brief upon reargument, the Government advances the claim that the decree of the District Court quieting the company's title to 428,986.68 acres of land lying outside the reserves, and directing that patents issue upon payment of any balance of fees due by the company, was erroneous as to 44,838.60 acres. It is asserted that 383,808.08 of the acres in question lie within the place limits of the grant but 45,178.60 acres lie within indemnity limits. Of these the Government concedes that, by a stipulation filed, 340 acres are to be patented to the company. As to the remaining acreage, the contention is that the company is not entitled to patents, although selections were filed with the Department of the Interior, prior to June 5, 1924.

It is said that, on grounds heretofore stated, the company's breaches disentitle it to further performance on the part of the Government. And, it is urged that, as to over 30,000 acres of the lands in question, the company assigned losses of mineral lands as base for indemnity selection and the alleged fraud in mineral classification vitiates the selection of this acreage as indemnity. The Government also asserts that some 13,000 acres of lands selected for patent prior to the bar date are Indian lands within the Crow reservation. The first contention

cannot prevail in view of the even division of opinion already stated; the second cannot, since the bill prays no affirmative relief in respect of the fraudulent classification it alleges; the third cannot, in the light of our decision stated under heading 10, *supra*.

Secondly, the Government urges, since the District Court has held that, in order to obtain compensation for the deprivation of rights to select lands lying within the withdrawn Government reserves, the company must assign base for the lands selected as to which compensation is claimed, the same principle must apply to selection rights exercised prior to the Resolution of June 5, 1924. It adds that the company has failed to show that in selecting lands within the indemnity limits prior to the date of that resolution it assigned base for such selections, to which the company replies that the Government is in error in asserting that it did not assign such base.

The argument with respect to the selected indemnity lands, which the District Court decreed should be patented to the company, first emerged in this court on reargument. In its original brief the Government said:

"The decree quiets title to the lands from the indemnity belts retained by the United States in the forest reserves and other reserves and directs the issuance of patents to the company for 428,986.68 acres, mostly in place limits of the grants. In these and several other respects the decree is not the subject of this appeal."

It is now said that, despite this concession, the point was preserved in the record below and is open here. We cannot agree.

By its exhibits Nos. 149 to 158, inclusive, the company listed the lands in place and indemnity limits which had been selected for patent amounting to over

455,000 acres. By stipulation of the parties certain of these were eliminated. Thereafter the Government, by its exhibits Nos. 103 (Revised) and 210 (Revised) listed the remaining lands as chargeable to the grant. With negligible exceptions the master found that they were so chargeable. In its findings the District Court adopted the master's ruling and stated definitely in its findings that the plaintiff took no exception to the master's report in connection with this matter. The court found, therefore, on the basis of the master's report, that the total of the lands both in place and indemnity limits so selected by the company should go to patent. The Government, while not controverting the fact found by the court that it had taken no exception to this portion of the master's report, points to an assignment of error filed on the appeal to this Court asserting that the District Court erred: "52. In, holding that the railroad is now entitled to receive patent to any of the indemnity lands mentioned or referred to in subdivision XVIII of the court's findings." Subdivision XVIII is that subdivision of the findings in which the court dealt with the whole matter of patents to be issued for lands selected prior to the adoption of the resolution of 1924 and does not deal specifically or separately with indemnity lands as contrasted with place lands.

It is obvious that the decision of the court sustaining the Government's position that, in the claim for compensation for loss of indemnity selection rights to lands within the reserves the company must assign base for the lands it alleged it lost by their withdrawal, furnishes no justification for the claim that the master or the District Court was asked to annul and hold ineffectual selection rights exercised with respect to lands outside the reserves which, but for the interposition of Congress in the Resolution of 1924, would have gone to

patent. Moreover, it is not clear from the record whether the company did in fact assign base in the lists of selection rights filed, or failed to do so. The implication from the record seems to be that the company did assign such base. In any event, we think the point was not brought to the master's or the court's attention in any such manner as to justify its being made the basis of a claim of error in this court. This must have been the Government's view when the case was first argued. In the light of its sweeping concession above quoted, and the state of the record, we are unwilling to disturb the District Court's decree as respects lands to be patented to the company.

20. *The company's claim to indemnity resulting from the Tacoma overlap.*

In its appeal (No. 4) the company challenges the rejection of its claim for loss of selection rights in second indemnity limits appurtenant to the Portland-Tacoma line. It is urged that the Joint Resolution of 1870, which made a grant in aid of this line, authorized the creation of second indemnity limits, in the event that there was a deficiency of lands in first indemnity limits, to supply loss of place lands lying along the route. The company insists that when, in 1898, 1902 and 1906, 213,000 acres of land were withdrawn and placed in national forests, these withdrawals deprived the company of selection of odd-numbered sections in second indemnity limits, as the 1870 grant was deficient in 1882, the date of the definite location of the last segment of the Portland-Tacoma line, and so remained.

For an understanding of the contention certain facts must be borne in mind. By the Act of 1864 the line authorized was to run from a point on Lake Superior to some point on Puget Sound, with a branch via the Columbia River to a point at or near Portland. By the Joint Resolution of 1870 the company was authorized to

construct its main line to a point on Puget Sound via the valley of the Columbia River with the right to construct its branch from a point on its main line, across the Cascade Mountains to Puget Sound. Thus the resolution altered what had been the proposed main line across the Cascade Mountains into a branch line, and the former branch line to Portland into a section of the main line running down the Columbia River to Portland and thence turning north to Puget Sound. Although by an Act of 1869 the company had been authorized to construct a line between Portland and Tacoma, and a right of way had been granted therefor, no grant of lands in aid of such construction was made until the adoption of the Resolution of 1870. That resolution in authorizing the location and construction of this portion of the company's road, did so in these words: "Under the provisions and with the privileges, grants, and duties provided for in its act of incorporation." Obviously the land grant was the same as that in the charter act, namely, place lands in a strip extending twenty miles on each side of the road in states and forty miles on each side in territories, with an indemnity belt ten miles in width on either side of the exterior limits of the place grant.

The legislative history of the resolution shows that Congress was informed the company could not obtain, in connection with its original grant, all that Congress intended it should have, for the reason that, prior to selection of indemnity lands for losses in place lands, much territory had been removed from the operation of the Act by pre-emption and settlement under the land laws. In order to compensate the company for such losses there was inserted in the Joint Resolution the following: "and in the event of there not being in any State or Territory in which said main line or branch may be located, at the time of the final location thereof, the amount of lands per mile granted by Congress to said

company, within the limits prescribed by its charter, then said company shall be entitled, under the directions of the Secretary of the Interior, to receive so many sections of land belonging to the United States, and designated by odd numbers, in such State or Territory, within ten miles on each side of said road, beyond the limits prescribed in said charter, as will make up such deficiency, on said main line or branch, except mineral and other lands as excepted in the charter of said company . . . to the amount of the lands that have been granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of subsequent to the passage of the act of July two, eighteen hundred and sixty-four."

The Resolution made a new grant in aid of the Portland-Tacoma line.[44] The portion of the Cascade branch (designated as main line in the Act of 1864) entering Tacoma from the east was definitely located in 1884. This location defined the place lands granted by the Act of 1864. The line authorized by the Joint Resolution entering Tacoma from the south was definitely located in 1874, thus earning the grant made by the Resolution. The place limits forty miles wide to the south of the Cascade line, and of equal width to the east of the Portland-Tacoma line, overlap. The area of the overlap, approximately forty miles square, contains alternate sections totaling 637,580 acres. The company says that, under the 1864 grant pursuant to which the Cascade line was built, title to the place lands vested in the company on the date of definite location, as of the date of the original grant; that these lands were thus lost to the grant of 1870 appurtenant to the Portland-Tacoma line;

[44] *United States v. Northern Pacific R. Co.*, 152 U. S. 284; *Northern Pacific R. Co.* v. *DeLacey*, 174 U. S. 622; *United States* v. *Northern Pacific R. Co.*, 193 U. S. 1.

and that, the company was entitled to indemnity for them. If this is the right view, 637,580 acres must be added to the other losses for which indemnity was needed at the date of the forest withdrawals and thus the deficiency in the grant required a large quantity of lands in second indemnity limits through the withdrawn lands, if any such limits were created in connection with the 1870 grant. The Land Office construed the Resolution of 1870 as requiring the laying down of second indemnity limits for the Portland-Tacoma line, and laid them down in 1906. The master and the court below concluded that no place lands were lost to the 1870 grant by the overlap. We are of opinion that they were right.

Several decisions respecting overlaps of railroad land grants are cited but none is precisely in point. It seems to be conceded that if the Cascade branch and the Portland-Tacoma line had been authorized by the same Act there would have been but a single grant of odd-numbered sections in the overlap and the company could not have claimed indemnity as for a grant of double aid in the area.[45] And it is settled that such a grant as that under consideration is a grant not of lands by quantity but of lands in place or by description.[46] Whether Congress intended, in connection with its later grant of 1870, to accord the company indemnity for failure to receive, in aid of the Portland-Tacoma line, lands to which it would get title in virtue of its definite location of the Cascade line, is the question. We conclude that Congress did not so intend.

[45] See *United States* v. *Oregon & California R. Co.*, 164 U. S. 526, 537.

[46] *Winona & St. Peter R. Co.* v. *Barney*, 113 U. S. 618, 627; *Barney* v. *Winona & St. Peter R. Co.*, 117 U. S. 228, 231–2; cf. *Wisconsin Central R. Co.* v. *Forsythe*, 159 U. S. 46, 59–60.

It is true that the grant of 1870 was upon the same terms as that of 1864. Unquestionably the company, in respect of the line built under the later grant, was entitled to indemnity for lands granted or disposed of by the United States to others prior to the grant. Indeed, it would be entitled to indemnity for loss due to an earlier overlapping grant to another railroad.[47] The grant of 1864, carried title to the lands within the overlap to the company and, therefore, Congress could not and did not make a second grant of the same lands in 1870. Did Congress intend to grant the company indemnity for a preceding grant, not to a stranger, but to the company itself? In answering the question we must bear in mind that if the grants had been contemporaneous no intent to make a double grant, or a grant of indemnity, would be inferred, and that the two grants here in question really dealt with but a single railroad system. We think it clear that Congress did not intend to confer a right to indemnity upon the company which would give it lands double in quantity at the point of intersection of two of its lines. As, in this view, the alternate sections in the overlap granted to aid the Cascade line by the Act of 1864, were not a loss to the grant to the Portland-Tacoma line made by the Resolution of 1870, the latter grant was not deficient and no right to select lands in second indemnity limits was infringed by Government withdrawals.

The appeal in No. 4 is without merit, but, upon the appeal in No. 3, the judgment is reversed and the cause is remanded for further proceedings as indicated in this opinion.

*No. 4, dismissed.*
*No. 3, reversed.*

MR. JUSTICE MURPHY took no part in the consideration or decision of this case.

---

[47] *United States* v. *Oregon & California R. Co.*, 176 U. S. 28, 50.