**UNITED STATES v. NORTHERN PAC. RY. CO. et al.**

**NORTHERN PAC. RY. CO. et al. v. UNITED STATES.**

No. E–4389.

District Court, E. D. Washington, N. D.

Aug. 28, 1941.

Norman Littell, Asst. Atty. Gen., and E. E. Danly and Robert E. Mulroney, Sp. Assts. to Atty. Gen., for plaintiff.

L. B. da Ponte, General Counsel, of St. Paul, Minn., Robert S. Macfarlane, Western Counsel, of Seattle, Wash., and F. J. McKevitt, District Counsel, of Spokane, Wash., for defendants Northern Pac. Ry. Co.

Alfred N. Hueston, of New York City, for defendant Bankers Trust Co.

John B. Marsh, of New York City, for defendant City Bank Farmers Trust Co.

Thomas Boylan, of Philadelphia, Pa., and R. L. Edmiston, of Spokane, Wash., for intervenors Chas. E. Schmidt, et al.

SCHWELLENBACH, District Judge.

This case is now before this Court on mandates from the Supreme Court of the United States dismissing the appeal of the defendants and on the appeal of the plaintiff remanding the cause to this Court for further proceedings as indicated in the Opinion of the Court filed December 16, 1940. That opinion is reported in 311 U.S. at page 317, 61 S.Ct. 264, 85 L.Ed. 210.

There has been filed with this Court a petition for leave to intervene by one Charles E. Schmidt and others claiming to be stockholders of the Northern Pacific

Railroad Company. The prayer of that petition is in six parts and it may be stated briefly that the purpose of the petition is to ask this Court to reopen and try a long-standing controversy between the petitioners as stockholders of the Northern Pacific Railroad Company and the defendant Northern Pacific Railway Company.

It is the understanding of the Court that it is the intention of counsel for plaintiff and defendants to present to the Court a stipulation of settlement of the controversies arising in this litigation and to ask the Court to sign the decree set forth in its entirety in said stipulation. (See note at end of this opinion.) The Court's information in reference thereto comes from a letter transmitted by the Attorney General on April 11, 1941, to the Vice President of the United States. This letter with its appendages has been printed as Senate Document No. 48 of the 77th Congress, 1st Session. (See note at end of this opinion.) That document was filed in this Court on June 12, 1941, by the petitioners for intervention attached to a petition asking the Court to temporarily suspend hearing on the above-described stipulation.

Since the petition for intervention is to be argued on its merits, I will not discuss it at this point further than to say that should it be granted, it is apparent that for the present the Court could not consider the above-described stipulation or the proposed decree. Consequently, it seems logical that the Court should first hear argument on the petition for intervention before considering the stipulation or the proposed decree.

Should the petition for intervention be denied, it would then become the duty of the Court to take up for consideration the the stipulation entered into and the decree which is proposed. While, under ordinary circumstances, the Court would welcome the opportunity to sign a decree compromising and settling the differences between respective parties to a piece of litigation based upon a stipulation of the parties without argument, it is my belief that, in this case, it is the Court's duty to require a complete discussion of all of the features of the settlement and the proposed decree before signing the decree. There are a number of reasons for this:

First: The public nature and the public importance of the controversy involved in this litigation.

Second: The fact that this litigation arose out of and was commenced as a result of an Act of the Congress of the United States.

Third: The amount of money and property involved in the litigation.

Fourth: The complexity of the litigation.

In order that counsel may understand the position which the Court takes and the reasons for it, I deem it advisable to discuss the case with a reasonable amount of detail.

Mr. Justice Roberts, writing the opinion of the Supreme Court, succinctly but exhaustively reviewed the litigation and the history of the events leading up to it. That being true, I feel the following brief statement will suffice:

In the Act of July 2, 1864, 13 Stat. 365, the Northern Pacific Railroad Company was authorized to lay out, locate, construct and maintain a railroad and telegraph line from a point on Lake Superior to Puget Sound with a branch to a point at or near Portland, Oregon. The Act was detailed in its requirements of the Company as to time of commencement and location of construction and completion. In aid of the construction, there was granted to the Company certain sections of land on each side of the line through the territories and states through which construction was proposed. The Act concluded with a reservation by Congress of power "at any time, having due regard for the rights of said Northern Pacific Railroad Company", to "add to, alter, amend, or repeal" the Act.

On May 31, 1870, a Resolution was passed by Congress, 16 Stat. 378, which revised the method of financing and further authorized the location and construction of the main road via the Valley of the Columbia River to Puget Sound and of a branch from the main line across the Cascade Mountains to Puget Sound. This Resolution made a similar grant of land in connection with the authorized additional construction.

Numerous controversies arose between the Northern Pacific Railroad Company and its successor—Northern Pacific Railway Company—and the United States between that time and 1924. Finally, on June 5, 1924, acting upon the recommendation of the President and the Secretary of Agriculture and the Secretary of the In-

terior, the Congress passed a joint resolution directing the Secretary of the Interior to withhold approval of any adjustment of the Company's land grants and the issuance of further patents and appointed a joint committee of Congress to investigate the whole problem. 43 Stat. 461. After almost five years of study the committee recommended the passage of a bill authorizing the Attorney General to institute an action by which "a final and complete determination of the respective rights of the United States and the Northern Pacific Railway Co. to the end that the grants shall be finally adjusted and the interests of the United States and the grantee shall be fully protected" might be secured. 46 Stats. 41, 43 U.S.C.A. §§ 921–929. On pages 332, 333 and 334 of Vol. 311 U.S., 61 S.Ct. 264, on page 271, 85 L.Ed. 210, the Supreme Court in its opinion made a detailed analysis of this Act.

Thereupon and in accordance with the provisions of the Act, the Attorney General commenced this action by filing a bill in this Court. For the purpose of this statement it seems sufficient for me to say that in its bill, the plaintiff prayed that title to all of the land in the controversy should be quieted in the United States Government and the United States should be compensated by a money judgment for the value of lands which it claimed to have been erroneously patented to the defendants. The relief asked in the answers filed by the defendants, briefly stated, was a dismissal of the action by the Government, an assertion of its title in certain lands and a claim for a money judgment against the plaintiff on lands of which it contended it had been unlawfully denied. The decree of Judge Webster in this case determined that the Railway Company was entitled to compensation for 1,453,061.02 acres of land; that the Company was entitled to patents to 428,986.68 acres of other lands and that the plaintiff was entitled to compensation for 65,829.77 acres found to have been erroneously patented to one of the defendant companies. Both parties appealed to the Supreme Court under the provisions permitting a direct appeal in the Act of Congress of May 22, 1936, 43 U.S.C.A. § 925 note. Due to the fact of Mr. Justice Murphy's previous participation in the litigation as Attorney General, the cases were considered by only eight Justices of the Supreme Court. As heretofore stated,

the decision of that Court was rendered and the opinion filed on December 16, 1940. It seems to me necessary that at this point we consider in detail that opinion which the Supreme Court rendered.

In its discussion concerning the law of the case, the Supreme Court broke down the case into 20 separate points. It seems to me that an understanding of the Supreme Court's opinion requires a grouping of the 20 points into 5 classifications as follows:

First: Points 1–6, inclusive, which consist of contentions by plaintiff as to breach of covenant by defendants so substantial in their nature that if they were upheld by the Court, judgment would necessarily be entered in favor of the plaintiff and against the defendant. Upon these 6 points the Justices who heard the case were equally divided. No opinion was expressed upon them.

Second: In this group, points number 7 and 8 were considered. They involved claims by the Government which, if sustained, would have precluded recovery by the defendants. On these points the Court sustained the position of the trial court and ruled against the plaintiff.

Third: This group consists of points 9, 10, 11, 12, 15, 16 and 19. They involve contentions of the Government going to the quantum of the award. In each point the Supreme Court sustained the position of the trial court and overruled the Government's contentions.

Fourth: This group consists of points 13, 14, 17 and 18. These points also are classified by the Supreme Court as involving contentions of the Government which go to the quantum of the award. As to these points, the decree of the trial court is reversed and they are remanded to the trial court for further action.

Fifth: This classification involves only point 20 under which the Supreme Court considered the company's appeal based upon the failure to allow its claim for additional selection rights as a result of the Portland-Tacoma overlap arising out of the Act of Congress of 1870. On this point the Supreme Court sustained the trial court and dismissed the appeal as being without merit.

I have made the foregoing classification in order that it may be apparent that under the mandates of the Supreme Court the

only questions returned by that Court to this Court for its consideration are those involved under group four consisting of Supreme Court points number 13, 14, 17 and 18. That being true, there seems to be no necessity for any more detailed discussion of groups 1, 2, 3 and 5. It seems to me, however, that I should discuss the questions involved in the 4 points classified by me as under group 4. Even as to those, I will be brief.

Point 13: This point involved paragraph 28 of the Bill of Complaint which refers to the Act of February 26, 1895, 28 Stat. 683, which provided for the examination and classification as mineral and non-mineral of place and indemnity lands within four land districts of Idaho and Montana. It alleges that the Act authorized commissioners to be appointed under it to classify approximately 11,500,000 acres of land. It alleges that they did so classify 3,382,377 acres as mineral and that the defendants made mineral lieu selections totaling 1,330,762 acres for which it received patents and that defendants are claiming approximately 2,451,615 additional lieu acres. It further alleges that the defendants were guilty of fraudulent and collusive practices whereby the Commissioners were persuaded to classify as mineral, lands of little value so that the defendant could select more valuable lands in lieu thereof. Judge Webster dismissed this paragraph on the basis of the argument presented by the Government. The Supreme Court concluded that the allegations of the paragraph were such that despite the argument of the Government, motion to dismiss paragraph 28 should be overruled and the Court should have proceeded to take testimony in reference thereto.

Point 14: This involves the inclusion by this Court of certain withdrawn lands as available for selection in lieu of excepted mineral lands. The Act of 1864 employs three descriptions of public lands, the place land was designated "public land, not mineral." The lieu lands which may be selected to make up losses in the place lands are referred to as "other lands." The mineral lieu lands are designated as "unoccupied and unappropriated agricultural lands." The issue revolved around the correct interpretation of the language "unoccupied and unappropriated agricultural lands" which might be selected in lieu of ineligible mineral lands. The Government contend-

ed that agricultural means " 'presently tillable' or presently fit for the plow". The defendants contended that for the purpose of this statute agricultural lands mean non-mineral lands. This Court, in its decree, accepted the contention of the defendants. The Supreme Court refused to accept the definition contended for by either party and substituted therefor the definition "land subject to be taken by pre-emptors or homesteaders under the public land laws." As to this point the case was remanded for ascertainment of the Company's selection rights as of the dates of the withdrawals in accordance with the foregoing definition.

Point 17: This involves paragraph 32 of the Bill in which there are set up disadvantages to the Government by the action of the Secretary of the Interior in pre-maturely withdrawing lands in the place and indemnity limits from settlement and pre-emption. In that paragraph it is alleged that as a result of the pre-mature withdrawal the Government suffered damages and that the defendants secured benefits to which they were not entitled. Frankly conceding that the proof of alleged advantages gained or losses suffered might be difficult, the Supreme Court directed this Court to take evidence thereon in an effort to determine such financial detriment to the United States or financial benefit to the Company.

Point 18: This involves one of the questions which was discussed but not decided by the Supreme Court in considering point 4. The Joint Resolution of 1870 provided "that all lands hereby granted to said company which shall not be sold or disposed of or remain subject to the mortgage by this act authorized, at the expiration of five years after the completion of the entire road, shall be subject to settlement and pre-emption like other lands, at a price to be paid to said company not exceeding two dollars and fifty cents per acre." In paragraph 13 of the Bill, it is contended that the Company failed to comply with that provision of the Resolution of 1870. The Government claims that such failure constituted a breach of the contract and a violation of the policy of the United States and defeated the Company's right to consideration either as to further selections or money compensation. As heretofore stated, the Supreme Court was evenly divided on that question. However, in par-

agraph 42 of the Bill, the Court is asked to determine the extent to which the Company has failed to comply with the obligation imposed by the Resolution of 1870 and to decree that the Company now perform its covenant to the extent that it is possible and where it is found impossible for the Company to perform, plaintiff asks, in the alternative, for damages or for an accounting as upon a constructive trust. The Supreme Court limited consideration of this paragraph to the lands granted by the Resolution of 1870 and excluded the lands acquired under the Act of 1864 and held that the Company could not be called upon to account as a trustee for the profits of the sale of the land. It then announced that the majority of the Court held that the proviso of the Resolution of 1870 required the Company to open the lands to pre-emption and settlement whether the lands were then subject to mortgage or not, that its failure to do so was a breach of its contract with the United States and that the Government is entitled to recover damages for such breach. This Court was directed to reinstate paragraph 13 of the Bill for the purpose of permitting the Government to prove its damages.

It now appears from Senate Document No. 48 that thereafter negotiations were commenced looking to the settlement of the controversy. The stipulation was entered into on April 11, 1941, which set out verbatim the judgment which it was proposed to be submitted to this Court. In the letter to the Vice President (I assume a similar letter was submitted to the Speaker of the House of Representatives), there is a brief statement of the history of the legislation; a description of the proposed settlement; the statement by the Attorney General that, in his judgment, settlement upon the basis set forth in the stipulation is in the best interests of the United States; notice that unless the Congress objected to the stipulation and the judgment within a period of 60 days that the Attorney General would proceed to complete the settlement.

As I indicated at the outset of this statement, I fully recognize the desirability of the termination of this litigation. After all, the ultimate objective of all litigation is that at some date it should be terminated. Experience has shown that the termination of litigation which is the result of compromise and settlement is usually more satisfactory than that which is carried to the bitter end through the Court. This case is a costly and expensive one to both parties. From that point of view alone, the termination by settlement is in the public interest.

■ I fully recognize the power of the Attorney General to control litigation in which the United States is involved. From the time of the adoption of the Judiciary Act of 1789 (1 Stats. 93, chap. 20, sec. 35 as construed in United States v. San Jacinto Tin Co., 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747) down to the present time (5 U. S.C.A. § 309, R.S. § 359. 5 U.S.C.A. § 306, R.S. § 361. 5 U.S.C.A. § 316, R.S. § 367), the duty and authority of the Attorney General to control and conduct litigation to which the Government may be a party has been recognized in the Statutes of the United States. The Supreme Court has, upon numerous occasions, so recognized it. United States v. San Jacinto, supra; New York v. New Jersey, 256 U.S. 296, 41 S.Ct. 492, 65 L.Ed. 937. In the case of New York v. New Jersey, which I have just cited, the Attorney General's specific authority to do so by stipulation was recognized.

■ This case, however, has two characteristics which are not usually found in ordinary litigation. In the first place, the public interest is involved to a very high degree and, second, the action was started in compliance with and as the direct result of an Act of the Congress of the United States. It is my belief that the combination of these two characteristics places upon me the responsibility first of determining the correctness of the view expressed by the Attorney General in his letter to the Vice President that the acceptance of this settlement by the Government is in the best interest of the Government (giving due weight to the opinion of the Attorney General) and, second, of being sure that the provisions of the settlement and of the judgment do not contravene in any way the provisions of the Act of June 25, 1929. I have reached this conclusion despite the fact that the proposed judgment is based upon a stipulation signed by the Attorney General of the United States. In this regard it seems to me advisable to consider briefly a few of the decisions of the Supreme Court upon the effect to be given by the Court to stipulations which may be entered into by counsel.

In the case of Utah & Northern Railway v. Fisher, 116 U.S. 28, 6 S.Ct. 246, 248, 29 L.Ed. 542, the parties had stipulated that certain railway property upon which taxes were in controversy was within the boundaries and upon a certain Indian reservation. It was contended, therefore, that the railway property was not subject to taxation. The Supreme Court said: "The stipulation and finding must, however, be read with reference to the legislation of congress, and therefore as only establishing that the road and property are within the exterior boundaries of the reservation. They will not be so construed as to allow the company to escape taxation by the force of a stipulation as to an alleged fact which that legislation shows does not exist."

In the case of California v. San Pablo & Tulare Railroad Company, 149 U.S. 308, 13 S.Ct. 876, 878, 37 L.Ed. 747, a stipulation was entered into by the Attorney General of the State of California and the attorneys for the Railroad Company that the question involved therein might be submitted to the Supreme Court despite the fact that the taxes, the validity of which constituted the question in the case, had already been paid. The Supreme Court said: "No stipulation of parties or counsel, whether in the case before the court or in any other case, can enlarge the power, or affect the duty, of the court."

In the case of Swift & Company v. Hocking Valley Railway Company, 243 U.S. 281, 37 S.Ct. 287, 289, 61 L.Ed. 722, a stipulation was entered into to the effect that a certain track near the warehouse of Swift & Company was a "private track" despite the fact that the record in the case disclosed, contrary to the statement in the stipulation, that the track in question was not a private track. The Court, through Mr. Justice Brandeis, quoted the language from the California case just cited and held the stipulation to be a nullity in this language: "If the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law. * * * If the stipulation is to be treated as an attempt to agree 'for the purpose only of reviewing the judgment' below, that what are the facts shall be assumed not to be facts, a moot or fictitious case is presented."

In the case of Sanford's Estate v. Commissioner, 308 U.S. 39, 60 S.Ct. 51, 59, 84 L.Ed. 20, stipulation was entered into concerning the administrative practices of the Bureau of Internal Revenue. Concerning the stipulation, the present Chief Justice said: "Such a stipulated definition of the practice is too vague and indefinite to afford a proper basis for a judicial decision which undertakes to state the construction of the statute in terms of the practice. * * * We are not bound to accept, as controlling, stipulations as to questions of law. Swift & Company v. Hocking Valley Ry. Co., 243 U.S. 281, 289, 37 S.Ct. 287, 289, 61 L.Ed. 722."

It is further of interest to note that in his exhaustive opinion upon the question of reorganization practise, Mr. Justice Douglas, in the case of Case et al. v. Los Angeles Products Co., 308 U.S. 106, 60 S. Ct. 1, 6, 84 L.Ed. 110, also cited the Swift & Company case in support of his statement that: "But in any event a stipulation does not foreclose legal questions." That citation and that quotation are a part of Justice Douglas' discussion as to whether or not an agreed plan was fair and equitable.

It is my belief that sections 1, 2, 3, and 4 of the Act of June 25, 1929, 43 U.S. C.A. §§ 921–924, constituted substantive law and that I have the responsibility to see that the decree entered herein does not contravene the provisions of such sections.

There is one other point which I feel I should discuss at this time. On page 5 of the letter of the Attorney General (Senate Document No. 48) [41 F.Supp. 287], the following statement is made: "In my judgment, settlement upon the basis of the terms set forth in the stipulation is for the best interest of the United States. The Secretary of Agriculture concurs in this view and the Secretary of the Interior has advised me that he has no objection to the settlement providing Congress authorizes me to settle on the basis proposed." As I construe the Attorney General's letter and the stipulation attached thereto, there has been no effort made to secure the authorization of the Congress for the stipulation and settlement. The procedure seems to have been merely the presentation of the stipulation to the Chairman of the Committee on Public Lands and Surveys of the Senate and the Chairman of the Public

Lands Committee of the House of Representatives with the request that said chairmen express to the Attorney General any opposition or objection which the respective committees may have had within a period of sixty days after the stipulation was transmitted to the chairmen. I have carefully examined the Act of June 25, 1929, 46 Stat. 41, and failed to find therein any express requirement of approval by the Congress. However, that Act did not contemplate a termination of the litigation by settlement. It provided that after the entry of the final decree, the Attorney General should report to the Congress and that the Congress should be allowed a reasonable time within which to enact legislation making effective the provisions of the decree. Were it not for the statement in the Attorney General's letter that the Secretary of the Interior conditioned his approval upon congressional authorization, I would not be troubled on this point. It seems to me that it must be remembered that the Resolution of June 5, 1924, grew out of a joint recommendation made by the President, the Secretary of Agriculture and the Secretary of the Interior. It must also be remembered that under the Statutes, the control of public lands rests in the Department of the Interior. There are three pertinent statutes as follows:

"There shall be in the Department of the Interior a Commissioner of the General Land Office, who shall be appointed by the President, by and with the advice and consent of the Senate." R.S. § 446, 43 U.S.C.A. § 1.

"The Commissioner of the General Land Office shall perform, under the direction of the Secretary of the Interior, all executive duties appertaining to the surveying and sale of the public lands of the United States, or in anywise respecting such public lands, and, also, such as relate to private claims of land, and the issuing of patents for all grants of land under the authority of the Government." R.S. § 453, 43 U.S.C.A. § 2.

"The Commissioner of the General Land Office, under the direction of the Secretary of the Interior, is authorized to enforce and carry into execution, by appropriate regulations, every part of the provisions of this title not otherwise specially provided for." R.S. § 2478, 43 U.S.C.A. § 1201.

Furthermore, it should be noted that in both the Joint Resolution of June 5, 1924, and the Act of June 25, 1929, specific instructions are given to the Secretary of the Interior as to what he should do and not do concerning lands involved in this controversy.

Unless additional action than that indicated in the stipulation has been taken by the Congress, it is clear that the Congress has not authorized the settlement proposed. Without expressing my opinion thereon, I pose to the respective counsel the question as to whether or not, in view of the expressed indication of the Secretary of the Interior that he withheld his approval unless Congress authorized the settlement, it is good public policy for the Court to approve the settlement of this important question without Congressional authorization?

Ruling on Petition for Intervention.

The only question before the Court at this particular time is the right of the Court to grant the petition and motion of Mr. Schmidt, and others associated with him, to intervene at this stage of the proceedings. And, again at the risk of being tedious, and in order that the record may be complete, I think it necessary to review the case from the point of view of this particular petition and motion to intervene.

This action was commenced July 31, 1930. On June 25, 1931, the complaint was amended. The answer of the Railway Company was filed July 18, 1931; the disclaimer of the railroad company was filed January 18, 1932. At that time the Government moved to strike the disclaimer, and thereupon the Railroad Company adopted the answer of the Railway Company. February 25, 1932, special defenses and answer was referred to the Master, and on the same date the legal defenses to the Bill were referred to the Master. The Master's first report on the special defenses and the legal defenses was filed May 31st, 1933, and that was adopted by the Court October 3rd, 1935. April 21, 1936, the matter was referred back to the Master to take testimony which was necessary as a result of the adoption of his report of May 31st, 1933, and after the taking of testimony in various and sundry parts of the United States the Master on July 26, 1937, made his report, and exceptions to the report were taken by the various parties on August 9 and August 13, 1937. Then for the first time, without leave of the Court Mr. Schmidt and his associates on August 25, 1937, filed motion for

extension of time to file exceptions to the Master's second report. And then on September 13, 1937, again without leave of the Court an answer and cross bill was filed by Mr. Schmidt and his associates—that was almost seven years after this action was started, after the pleadings had been made up, and many arguments and careful consideration after all testimony had been taken, and the Master's report had been made.

On September 13, 1937, the Government moved to strike the answer and cross complaint of Mr. Schmidt and his associates, and then two days later, September 15, the defendants made the same motion. Thereafter, on January 31, 1938, for the first time Mr. Schmidt and his associates filed a motion for leave to file petition in intervention, accompanied by proposed interrogatories. I have carefully examined that motion and petition and the interrogatories, and so far as the relief sought in the matter now before the Court it is precisely the same relief as was sought in the motion of January 31, 1938. The interrogatories which were submitted in reference to this petition and motion are precisely and exactly the same as the interrogatories submitted January 31, 1938. I make that clear so there can be no question but what the action this court took, and the other courts took, was upon precisely the same question that Counsel is now attempting to present here.

On February 19, 1938, Mr. Schmidt and his associates filed a motion to construe, modify and amend the report of the Special Master of July 26, 1937, and on March 7, 1938, Judge Webster struck out the answer and cross complaint, denied the petition to intervene, denied the motion of February 19, 1938, denied the motion for extension of time for exceptions, and included in that order the proviso which is quoted in the motion and petition of Mr. Schmidt and his associates, here, reserving to those individuals the right to assert their claim or claims in any other proceeding. That clearly was not a reservation to the effect that they might come back into this case again, but was simply a statement by the Court that anything this Court did at that time was not to be prejudicial to Mr. Schmidt and his associates in starting any other case they might want to in any jurisdiction of the United States.

March 11, 1938, notice was given by Mr. Schmidt and his associates and application for the Court to review, revise and amend the order of March 9, 1938, and amend their bill and answer by making a part of the cross complaint and answer the intervening petition and answer. March 17, 1938, Mr. Schmidt and his associates filed a motion to dismiss the bill of complaint and amended bill of complaint.

March 22, 1938, Judge Webster denied these two motions, the motion and application of March 9, 1938, and the motion of March 17, 1938, but in this order he made the reservation, which on page 2 of the present motion and petition was incorrectly quoted, as Mr. Boylan pointed out. It should read this way: "It is further ordered that the order shall be without prejudice to the right of the said Charles E. Schmidt, George Landell, Executor of E. A. Landell, deceased, Clarence Lobenthal, Trustee of Bernard Lobenthal, and Walter L. Haehnaen, themselves, or as representatives of other stockholders of the said Northern Pacific Railroad Company, or to such other stockholders themselves, to assert later in this cause when the fund, if any, to be distributed by the United States, is established and fixed, or in any other proceeding any rights which they may have by reason of the matters and things alleged in said answer and cross bill and in said intervening petition."

In other words, Judge Webster restated the reservation of the right of these parties to start other actions and was not prejudicial to them to start other actions, as provided in his decree or order of March 11, 1938, adding to it "to assert later in this cause when the fund, if any, to be distributed by the United States is established and fixed".

If these petitioners have any right to proceed in this cause at the present time, it must of necessity come only from that language in the order of March 22, 1938. On the same day Judge Webster directed the presentation of Findings of Fact and Conclusions of Law, and on the same day Mr. Schmidt and his associates filed assignments of error against the entire proceedings.

The decree in this case was signed by Judge Webster on June 27, 1939.

On July 25, 1938, Judge Wilbur of the Circuit Court of Appeals, after having the matter presented to him, allowed an appeal from the order of the trial Court of March 9, 1938, denying the application to inter-

vene, but denied the application as to all other orders embraced in the order of March 9, 1938, and the Circuit Court of Appeals assumed jurisdiction over this action to the extent that Judge Webster had denied the petition of Mr. Schmidt and his associates to intervene. This matter was argued before the Circuit Court of Appeals and in that case they decided, as I view the opinion, four things:

First, that in so far as Schmidt and his associates sought to present matters presented by the Railway Company and the Railroad Company it is without merit, in that there is no showing that such issues were not adequately presented by the Railway Company in this action;

Second, there was no duty placed upon the Court by the Act of June 25, 1929, to make a decision upon any question not presented to it by the parties in the action;

Third, that the Act of June 25, 1929, did not contemplate or authorize litigation of claims by stockholders of the defendant company.

There has been an assertion made here that the act did contemplate such action, but clearly in the language of Judge Wilbur in the case reported entitled Schmidt et al. v. United States, 9 Cir., 102 F.2d 589, on page 596, the Court said: "As to the latter, we hold that the act of June 25, 1929, did not contemplate or authorize the litigation of claims between the stockholders of the defendant corporations in the suit brought by the Attorney General on behalf of the United States and, consequently, that appellants had no right to intervene in the action, and the order denying leave to so intervene was correct."

They then went ahead on the fourth point that even if it did contemplate such litigation that this application was not timely.

Here we have a situation where the only rights these parties have to appear before the Court at this time arises in the language of Judge Webster in his decision where he says that the order shall be without prejudice to the right to assert later in this cause when the fund, if any, to be distributed by the United States is established and fixed.

■ I can't help but conclude that upon the appeal to the Circuit Court of Appeals, despite the fact that the Circuit Court did not expressly say that the language in the order of March 22, 1938, was improper, they did say there was nothing in the Act of June 25, 1929, which contemplated or authorized the litigation of the claims between the stockholders of the defendant corporations in the suit brought by the Attorney General on behalf of the United States. The Circuit Court said "that appellants had no right to intervene in the action", and by that action the Circuit Court of Appeals, I am satisfied, nullified that statement in the order of March 22, 1938, which reserved to these parties the right later in this cause to present their claim to any fund which might be established or fixed by the United States.

That decision was handed down April 27, 1939. Prior to that time, May 16, 1938, in an effort to go directly to the Supreme Court under the provisions of the Special Act of 1936, 43 U.S.C.A. § 925 note, the matter was presented to the Supreme Court and in their decision, Northern Pacific Railway Company v. United States, May 16, 1938, 304 U.S. 545, 58 S.Ct. 1036, 82 L. Ed. 1518, the Court used this language: "The application, presented to the Chief Justice and referred by him to the Court, is denied".

Then after the decision by the Circuit Court of Appeals, and on October 9, 1939, the case of Northern Pacific Railway Co. et al. by Schmidt et al., v. United States et al., 308 U.S. 508, 60 S.Ct. 71, 84 L.Ed. 434, we find this Per Curiam decision: "The application for the allowance of Appeals presented to Mr. Justice Reed and referred by him to the Court is denied".

On the same day we find another Per Curiam decision, Ex parte Northern Pacific R. R. Co., by Schmidt et al., 308 U.S. 508, 60 S.Ct. 71, 84 L.Ed. 434: "Motion for leave to file petition for writ of mandamus is denied."

Then on the same date, October 9, 1939, two cases, Schmidt et al. v. United States et al., and Northern Pacific Railroad Co. by Schmidt et al., v. United States et al., 308 U.S. 569, 60 S.Ct. 83, 84 L.Ed. 478, we find this Per Curiam decision: "Petitions for writs of certiorari to the United States Circuit Court of Appeals for the Ninth Circuit * * * denied".

Then on February 26, 1940, United States v. Northern Pacific Railway Company et al., and Northern Pacific Railway Company et al. v. United States, 309 U.S. 626, 60 S.Ct. 585, 586, 84 L.Ed. 987: "Motion of the Minority Stockholders of the Northern Pacific Railroad Company for

leave to appear and present oral argument in these cases denied".

On October 14, 1940, United States **v.** Northern Pacific Railway Company et al., 311 U.S. 613, 61 S.Ct. 57, 85 L.Ed. 389, we find a Per Curiam decision: "The motion for leave to file brief of the Minority Stockholders of the Northern Pacific Railway Company is denied".

So we have clearly the question presented to the Circuit Court of Appeals and decided by them in 102 F.2d and presented to the Supreme Court of the United States, and in both cases denied.

I find myself in this position: Precisely this same question has been presented to this Court, to the Circuit Court of Appeals and to the United States Supreme Court, and on all occasions has been denied. If it was not timely for Mr. Schmidt and his associates to file in 1937 the petition to intervene at a time when the case was before this Court in its original hearing, certainly it isn't timely to file it now after the case has gone to the Supreme Court of the United States, and has been sent back, except on the one possibility and that is that Judge Webster reserved the right to proceed in another action, and I think the Circuit Court of Appeals specifically nullified that proviso in Judge Webster's order of March 22, 1938, and since the matter went to the Supreme Court in two different ways, and in both instances denied the appeal and denied the issuance of a writ, that question has been decided by the Supreme Court as well as the Circuit Court of Appeals.

Then, furthermore, there is filed by Mr. Schmidt and his associates as part of their motion to suspend the hearing upon the stipulation Senate Document No. 48, in which is included the Attorney General's letter, and there is nothing in there which sets up any fund in the Northern Pacific Railway Company or the Northern Pacific Railroad Company in which these parties could participate if they had a right to participate.

The motion of Schmidt and his associates, the petition and motion to intervene and for consideration of relief are denied.

Mr. Edmiston: Allow us an exception and we give notice of our intention to appeal.

Judge SCHWELLENBACH: The record will show the exception is allowed.

That is the right of every party against whom a ruling has been made, but I do not want the record to show that I think you have the right to appeal, or right of review by any appellate court. You have tried them all. But I will allow the exception.

### Ruling on Acceptance of Stipulation Made After the Introduction of Testimony and Argument of Counsel

Judge SCHWELLENBACH: The way I analyze this matter on the question of the reasonableness of the settlement, it seems to me in so far as any substantial rights that are attached by either the decree of Judge Webster or by the proposal of the Supreme Court that the matter be retried as to the first two of the four points those rights have been obtained by the release by the Railway Company. The other two questions are in the category which we so often find in cases of litigation where one has a perfectly good lawsuit and can not prove it, and I do not believe it would ever be possible for the Government to go back these many years and prove either of the necessary facts in order to recover damages, or what its measure of damage is.

On the second question I raised as to the relationship between this decree and the provisions of the act of June 25, 1929, I think there is sufficient showing made that there is nothing in this proposed decree which in any way contravenes the substantive provisions of the Act of June 25, 1929.

The third point has given me more difficulty. I can see nothing in the Act of 1929 which made it necessary for the Attorney General to present this matter either to the Secretary of the Interior, the Secretary of Agriculture or to Congress itself. There is nothing in the Act which did require the Attorney General to submit it. However, the Attorney General did take up the matter with the Secretary of Agriculture, and the Secretary of the Interior and, very unfortunately, included in his letter to the Vice President and to the Speaker the statement that the Secretary of the Interior had advised him he had no objection to the settlement providing Congress authorized him to settle. Congress has not authorized the settlement. The act which was taken by the Committees is not an act of Congress, and is in no way binding on the Congress, and tak-

ing the language of the Attorney General's letter to the Vice President and the Speaker, the procedure pursued was not in conformity with that language. When Senator Adams writes a letter recommending some kind of settlement I know it is the result of careful consideration by his committee, and when he goes out of the way to praise it, being as conservative as he is in his use of the language, I know the settlement not only received the approval but the positive approval of the Committee on Public Lands in the Senate. I am compelled to look to the letter of the Secretary to determine what he means when he uses the word "authorizes" because the word when used in the letter of the Attorney General has not been complied with —but in the letter from the Secretary of the Interior to the Attorney General he says: "I note that the proposed stipulation contains a proviso to the effect that it shall not be binding upon the parties thereto unless and until the Attorney General of the United States shall have been authorized by congressional action to compromise and settle said cause upon the terms and conditions therein expressed"—

Mr. Mulroney: That is a misstatement, your Honor—

Judge SCHWELLENBACH: I am construing it that when he used the word "authorized" he had in mind the language of the proposed stipulation which specifically sets forth: "Inasmuch as the Attorney General of the United States will communicate the terms and conditions of this stipulation to the Chairman of the Committee on Public Lands and Surveys of the United States Senate and the Chairman of the Public Lands Committee of the House of Representatives of the United States in order to give said Committees an opportunity to express any objection to the settlement contemplated hereby, it is further understood and agreed that this stipulation shall not be binding upon the parties hereto if objection to such settlement is received by the Attorney General on or before June 16, 1941, from either of said Chairmen. If no such objection is received, this stipulation will be submitted to the above-named Court at the earliest date convenient to Court and parties after June 16, 1941".

That is the only language in the stipulation which refers to any action by Congress. When the Secretary of the Interior used the language "I note * * *

that it shall not be binding upon the parties thereto unless and until the Attorney General of the United States shall have been authorized by congressional action to compromise and settle said cause" I have to construe when he used "authorized" he meant the procedure which the stipulation proposed. I can not come to any other conclusion. If he had not mentioned "stipulation" I would be compelled to ask you to go back to get the Secretary of the Interior to change his request, or to get Congress to authorize it.

 I think there were two unfortunate uses of the word "authorize", one by the Secretary of the Interior and one by the Attorney General, but since the Secretary of the Interior specifically refers to the stipulation I think he meant the kind of "authorize" which is contained in the stipulation. I will sign the decree.

NOTE.—

77th Congress 1st Session

Senate Document No. 48

Title to Northern Pacific Railroad Land Grants

Letter from The Attorney General Transmitting Pursuant to Law A Report of Judicial Proceedings Concerning Title to Certain Northern Pacific Railroad Land Grants, Together with a Proposed Stipulation for the Settlement of the Controversy

April 18, 1941.—Referred to the Committee on Public Lands and Surveys and Ordered to be Printed

Office of the Attorney General, Washington, D. C., April 11, 1941.
Hon. Henry A. Wallace,
Vice President of the United States.
My Dear Mr. Vice President: By act of June 25, 1929 (ch. 41, 46 Stat. 41, 43 U.S. C.A. §§ 921–929), Congress directed the Attorney General to institute and prosecute such suit, or suits, as might, in his judgment, be required to remove the cloud cast by the claims of the Northern Pacific Railway Co. on the title of the United States to approximately 2,900,000 acres of land which had been withdrawn by the United States for its own purposes and which were located in the indemnity limits of the land grants made to the Northern Pacific Rail-

road Co. by act of July 2, 1864 (ch. CCXVII, 13 Stat. 365) and joint resolution of May 31, 1870, No. 67 (16 Stat. 378) to which grants the Northern Pacific Railway Co. succeeded.

The act retained the land in question for the United States freed of any claim the companies might have to them and authorized an award of compensation to the companies in the event the court should determine that their claims were meritorious. The act also required that, in the contemplated suit or suits, all controversies and disputes between the United States and the companies should be presented and should be judicially determined and that a full accounting should be had between the United States and the companies and any other parties claiming under the provisions of the grants.

In response to the direction contained in the act a suit was commenced in the District Court of the United States for the Eastern District of Washington, Northern Division. The suit was entitled United States of America, plaintiff, v. Northern Pacific Railway Company, Northern Pacific Railroad Company, Northern Pacific Railroad Company as reorganized in 1875, Northwestern Improvement Company, Bankers Trust Company, Guaranty Trust Company, and City Bank Farmers Trust Company, defendants. The case became No. E-4389. In its bill of complaint the United States alleged ownership and possession of the lands in question; that the railway company was asserting claims to them; that the companies had breached the terms, conditions, and covenants of the granting acts in certain material respects; that they had been guilty of fraud in the course of the administration of the grants; that errors had occurred in the administration of the grants by which the companies had obtained lands to which they were not entitled; that, because of such breaches, fraud and errors, the claims of the railway company to the lands in question were without merit; and that, notwithstanding that such claims were without merit, they clouded the title of the United States to the withdrawn lands in question. The United States prayed that the claims of the railway company to such withdrawn land be determined to be without merit; that the claims of such company to compensation for any and all of the lands in question be denied; that the title of the United States to such land be quieted in it;

and that the United States be awarded judgment against the railway company for the value of any lands found to have been erroneously patented to the companies.

Answers were filed by all defendants except the Northern Pacific Railroad Co. as reorganized in 1875 and the defendant Guaranty Trust Co. The court found that the former of these defendants did not exist. The latter filed a disclaimer. The remaining defendants filed answers in which they moved to strike various subdivisions of the Government's bill, pleaded defenses of laches, limitations, waiver, res judicata, equitable estoppel, and bona fide purchaser against the charges of the United States. In addition, the defendant Northern Pacific Railway Co. asserted an equitable title in the withdrawn lands in question; that its title thereto had been expropriated by the United States, and prayed that it be awarded a judgment against the United States for the amount found due it by reason of such expropriation, together with interest thereon.

The cause was thereupon referred to a special master for determination of the motions to dismiss and special pleas. Testimony was taken on the pleas, argument was heard, and the special master submitted a report recommending that some of the motions and special pleas be sustained; that the motion and special pleas to numerous allegations of the bill charging breaches, fraud, and error be sustained; and that the subdivisions containing such allegations be dismissed from the bill. Exceptions to the report were filed, argued, and submitted to the court. The court overruled all exceptions, approved the report in full, and by order of October 3, 1935, dismissed from the bill of complaint certain subdivisions thereof, above referred to.

The cause was thereupon rereferred to the special master for trial on the merits, on the issues presented by the pleadings as they then existed, except that the master was directed not to take any evidence as to the value of the lands in controversy or as to the amount of compensation due the plaintiff or any of the defendants. He was directed to determine what lands should be accounted for by the United States or by the companies, to make findings of fact and conclusions of law, and to submit his recommendations for a decree thereon. Thereupon, the cause was tried by the master as directed in the order of rereference

286

and the master submitted his second report finding and concluding that the railway company was entitled to be compensated for certain specific lands aggregating approximately 2,400,000 acres of the withdrawn lands in question. Exceptions to this report were filed by all parties. On hearing thereon, all exceptions of the defendants were overruled and the exceptions of the United States were sustained in part and overruled in part. After further proceedings before the court, made necessary by such rulings on exceptions to the master's report, the court on June 27, 1939, entered his decree determining that the railway company is entitled to compensation for 1,453,061.02 acres of the withdrawn lands; holding that the company is entitled to patents to 428,986.68 acres of other lands in the primary and indemnity limits of the grants, which had been charged to the company in the adjustment of the grants but for which patents had not been issued; and determining that the United States is entitled to compensation for 65,829.77 acres of lands found to have been erroneously patented to the railroad company or railway company.

An appeal to reverse parts of the order of October 3, 1935, and parts of the decree of June 27, 1939, was taken by the plaintiff to the Supreme Court of the United States, and a like appeal was taken by the defendants to reverse certain parts of the decree of June 27, 1939. These appeals were taken directly to the Supreme Court under the provisions of the act of Congress of May 22, 1936 (ch. 444, 49 Stat. 1369, 43 U. S.C.A. § 925 note), authorizing direct appeals to that court to review the order of October 3, 1935, and decree of June 27, 1939.

On December 16, 1940, the Supreme Court [United States v. Northern P. R. Co., 311 U.S. 317, 61 S.Ct. 264, 85 L.Ed. 210] announced its decision affirming the action of the lower court with respect to the matters involved in the defendants' appeal and reversing it with respect to certain matters involved in the appeal of the United States. The Supreme Court affirmed the action of the district court in directing the issuance to the railway company of patents covering the 428,986.68 acres referred to above. As a result of the decision of the Supreme Court, the cause has been remanded to the district court with instructions to restore to the bill of complaint certain of the charges of

breach of contract and fraud which had been stricken by the lower court and to try the issues presented by such charges and the answers thereto. A mandate to carry out these instructions has been sent by the Supreme Court to the district court.

More specifically, the matters for the trial of which the cause was remanded, are as follows:

1. The claim of the company to more than a million acres of the 1,453,061.02 acres for which the lower court awarded compensation was based upon the company's asserted right to lands in the indemnity limits in satisfaction of an alleged loss of an equivalent area of lands within the place limits of the grant, due to the classification of such place lands as mineral in character, which classification resulted in the exception of such lands from the grants under their express terms. The United States charged that this classification was brought about by fraudulent conduct on the part of the companies and contended that the alleged fraud, if established, would disentitle the company to any further indemnity lands and would therefore defeat the railway company's claims to compensation for any of the withdrawn lands in question. The view urged by the United States was upheld by the Supreme Court and the cause was remanded to afford the United States an opportunity to prove its charges of fraud.

2. The United States complained on its appeal that, even assuming the validity of the so-called mineral losses referred to in the preceding paragraph, the lower court was in error in awarding to the railway company compensation for the approximately 1,000,000 acres of indemnity lands referred to, for the reason that, under the express language of the granting act, mineral losses in the primary limits could be satisfied only by the selection in the indemnity limits of lands which were "agricultural" in character, in the ordinary meaning of the term, whereas it had been found by the trial court that the major part of the million acres of indemnity lands in question were not agricultural in fact. Notwithstanding this finding, the lower court construed the term "agricultural" as synonymous with "nonmineral" and permitted the selection and held that the company is entitled to compensation. The Supreme Court concluded that neither interpretation was correct but that the lower court had permitted a much broader selec-

tion right than was authorized by the act, held that the selection right was limited to lands which under the existing practice of the Land Office a settler could have taken under the preemption and homestead laws, and remanded the cause for a further showing consonant with such ruling.

3. The United States alleged in its bill that the companies had breached a certain requirement of the joint resolution of May 31, 1870, by failing to open to settlement and preemption at prices not exceeding $2.50 per acre to be paid to the company, all lands which had been obtained under the grants and which they had not sold or disposed of at the expiration of 5 years after the completion of the road. The companies admitted their failure but contended that the requirement had never become applicable to any lands. The lower court upheld the companies' contention and dismissed these allegations from the bill. This action was reversed by the Supreme Court and the cause was remanded to the district court with instructions to reinstate the allegations and permit the United States to prove the damages suffered by it by reason of the companies' breach in this respect.

4. The United States alleged that the companies had received unauthorized benefits due to the error of the Interior Department in withdrawing public lands for the benefit of the company, within the primary limits of the grant, upon the filing by the company of a map of the general route of its road, whereas such withdrawals should not have been made prior to the subsequent filing of maps of definite location, and had withdrawn for the benefit of the company lands in the indemnity limits of the grant, whereas such withdrawals were wholly unauthorized. These withdrawals were subsequently determined by the Supreme Court to be illegal but only after they had remained in force for a number of years, thus preventing settlers from obtaining the lands so withdrawn and enabling the company, ultimately, to obtain lands which otherwise would have been obtained by the settlers. The lower court struck these allegations from the bill on motion of the defendants. On its appeal the United States complained of this action. The Supreme Court reversed the decision of the lower court, ordered the allegations reinstated, and remanded the cause to afford the United States an opportunity to show the damages suffered by it by reason of such errors.

At this stage of the proceedings the defendants submitted a proposal for the settlement of the entire controversy. They propose—

(1) To relinquish their claim against the United States to compensation for the 1,453,061.02 acres of withdrawn lands still in question, the courts having denied their claim to the remainder of the approximately 2,900,000 acres originally in question;

(2) To relinquish their claim to approximately 363,000 acres of the 428,986.68 acres for which they were awarded patents by the decree of June 27, 1939, which the Supreme Court affirmed (the remainder of the area having been sold by the company to bona fide purchasers), to consent to an appropriate amendment of the decree, and to make any necessary conveyances of this area to the United States;

(3) To consent to a judgment in the sum of $300,000 against the railway company and in favor of the United States.

In consideration the United States would agree—

(1) To discharge its claim against the company for lands erroneously patented;

(2) To relinquish its claim to damages for violation of the $2.50 per acre sales proviso.

(3) To relinquish its claim to damages growing out of the illegal withdrawal for the benefit of the company referred to above.

The proposed settlement will include a discharge of all other claims which were presented in the suit and have been heretofore disposed of. The terms of the proposed settlement have been submitted in writing to this Department, and they are embodied in a proposed stipulation which has been tentatively agreed to by the company, a copy of which is attached hereto.

In my judgment, settlement upon the basis of the terms set forth in the stipulation is for the best interest of the United States. The Secretary of Agriculture concurs in this view and the Secretary of the Interior has advised me that he has no objection to the settlement providing Congress authorizes me to settle on the basis proposed.

Your attention is directed to paragraph IX of the stipulation by which its effective-

ness is suspended to afford Congress an opportunity to object to settlement on the basis of the terms proposed. If there is no such objection, I shall appreciate being so advised. If, however, I am not advised of any such objection within 60 days from the date hereof, I shall assume that none exists and will proceed to complete the settlement.

It is respectfully suggested that this letter and the proposed stipulation be referred to the appropriate committee of the Senate.

With kind regards,

Sincerely,

Robert H. Jackson,

Attorney General.

### Stipulation

In consideration of the mutual agreements of the parties hereto (the above-named defendant Northern Pacific Railroad Company as reorganized in 1875 having been eliminated by the conclusion of the court that no such company exists and the defendant Guaranty Trust Company having been eliminated by its disclaimer), it is hereby stipulated and agreed by and between the United States of America, plaintiff in the above-entitled cause, and Northern Pacific Railway Company, Northern Pacific Railroad Company, Northwestern Improvement Company, Bankers Trust Company and City Bank Farmers Trust Company, defendants in said cause, as follows:

1. The defendants and each of them hereby agree to and do hereby relinquish and release all claims now made or which may have been heretofore made by them, or any of them, to any right, title, or interest in or to each and all of the tracts or parcels of land described in a schedule marked "Schedule 1" referred to in the proposed judgment hereinafter set out, and do hereby release and relinquish all claims that they or any of them have, or claim to have, to payment or compensation for or on account of said lands or on account of their respective claims thereto and said defendants and each of them hereby consent that any claims they may have to said lands or to compensation on account of said lands, may be disallowed by the court and that the court may enter a judgment in the above-entitled cause forever quieting the title of the United States of America thereto or therein against such claims.

2. The defendant Northern Pacific Railway Company hereby agrees to pay to the United States the sum of $300,000.00 and hereby consents that judgment may be entered against it and in favor of the United States for such amount with interest thereon at six percent per annum until paid.

III. The defendants hereby agree to and do hereby relinquish all claims that they or any of them now make or have heretofore made to the lands described in a schedule marked "Schedule A" attached to and made a part of the decree of this court entered herein on June 27, 1939, except such of said lands as are described in a schedule marked "Schedule 2" to be attached to the proposed decree hereinafter set out, as to which excepted lands said defendants agree to and do hereby relinquish their claims to all of such of the lands described therein as the Secretary of the Interior, in considering the release filed with him by the Northern Pacific Railway Company in compliance with the provisions of Section 321(b), Part II, Title III of the Transportation Act of 1940, 49 U.S.C.A. § 66(b), shall find have not been sold by said company, prior to September 18, 1940, to bona fide purchasers, except such of said lands as said Secretary shall find have been acquired prior to said date by third persons claiming under unredeemable tax sales.

IV. The plaintiff, United States of America, agrees to and does hereby relinquish each and all of the claims asserted by it in the above-entitled cause to compensation for or on account of lands claimed to have been heretofore erroneously patented or certified to the Northern Pacific Railroad Company or Northern Pacific Railway Company under the terms of the Act of July 2, 1864, c. CCXVII (13 Stat. 369), or Joint Resolution of May 31, 1870, No. 67 (16 Stat. 378), or acts relating thereto and supplementary thereof, other than the claim to lands described in "Schedule N" attached to the decree of this Court entered herein on June 27, 1939, as to which the carrying out of the judgment contemplated by this stipulation shall constitute satisfaction.

V. The plaintiff, the United States of America agrees to and does hereby relinquish the claim asserted by it in the above-entitled suit against the Northern Pacific Railroad Company and Northern Pacific Railway Company, for damages on account of the alleged breach by said companies of a certain proviso contained in the Joint Resolution of May 31, 1870, requiring that

all lands thereby granted to the Northern Pacific Railroad Company which shall not have been sold or disposed of at the expiration of five years after the completion of the road shall be subject to settlement and preemption like other lands at a price to be paid to said company not exceeding two dollars and fifty cents per acre.

VI. The plaintiff, United States of America, agrees to and does hereby relinquish its claims asserted in the above-entitled cause against the Northern Pacific Railroad Company or Northern Pacific Railway Company to damages resulting to it by reason of the illegal withdrawals for the benefit of the Northern Pacific Railroad Company of lands within the primary limits of its grants, which withdrawals were made upon the filing of maps of the general route of its road and to relinquish its claim asserted in said cause, to damages resulting to it by reason of the illegal withdrawals for the benefit of said company of lands in the indemnity limits of the grants made to said Northern Pacific Railroad Company, referred to above.

VII. For the purpose of carrying out the terms of this stipulation the parties hereto each consent and agree, subject to the approval of the court, that, without further findings of fact, a judgment may be entered in said cause which, in addition to the title, date, signature, and attached schedules, shall read as follows:

"This cause having come on to be heard on this ... day of ..., 1941, before the Honorable Lewis Schwellenbach, Judge of said Court, the plaintiff United States of America being represented by ..., the defendants Northern Pacific Railway Company, Northern Pacific Railroad Company, and Northwestern Improvement Company being represented by ..., the defendant Bankers Trust Company being represented by ..., and the defendant City Bank Farmers Trust Company being represented by ..., the attorneys for all of said parties being present in open court and being duly authorized to represent said parties, and the court having considered the stipulation of the parties to the above-entitled suit, filed herein on this date, and having heard the statements of counsel, it is hereby ordered, adjudged, and decreed, as follows:

"1. All claims of said defendants, or any of them, to any right, title, or interest in and to each and all of the tracts and parcels of land described in a schedule marked "Schedule 1" attached hereto and made a part hereof, or to compensation therefor or on account thereof, are hereby decreed to be invalid and of no force or effect and the cloud cast by such claims on the title of the United States to such lands is removed and the title of the United States to each and all of such tracts and parcels of land is hereby quieted in the United States against such claims, without payment to the defendants or to any of them of any compensation therefor or on account thereof.

"2. That the plaintiff, United States of America, be and it is hereby awarded judgment against the defendant Northern Pacific Railway Company in the sum of $300,000.00, together with interest thereon at six percent per annum until paid.

"3. That the decree of this Court entered herein on June 27, 1939, be and the same is hereby amended and modified by eliminating from the land descriptions contained in 'Schedule A' attached thereto the descriptions of all of said lands other than those described in 'Schedule 2' attached hereto and made a part hereof, and by eliminating from said Schedule A the descriptions of all the lands described in said Schedule 2 except those lands which the Secretary of the Interior, in considering the release filed with him by the Northern Pacific Railway Company in compliance with the provisions of Section 321(b), Part II, Title III of the Transportation Act of 1940, shall find were, prior to September 18, 1940, sold by said Northern Pacific Railway Company to bona fide purchasers or were, prior to said date, acquired by third persons under unredeemable tax sales. The claims of the defendants, and each of them, to all the lands, the descriptions of which are thus eliminated from said Schedule A, are decreed to be without merit and of no force or effect, the cloud cast on the title to said lands by said claims is hereby removed and the title of the United States to said lands is hereby quieted in the United States; that said decree of June 27, 1939, is hereby confirmed with respect to the lands described in said Schedule A not thus eliminated therefrom.

"4. That the claims of the plaintiff, the United States of America, asserted in the above-entitled cause, of a right to be compensated for lands alleged by it to have been heretofore erroneously patented or certified to the said Northern Pacific Railroad Company or the said Northern Pacific Railway Company under the granting

act of July 2, 1864, c. CCXVII (13 Stat. 369), or Joint Resolution of May 31, 1870, No. 67 (17 Stat. 378), or acts supplemental thereto, other than the claim to be compensated for the lands described in "Schedule N" attached to the decree of this Court entered herein on June 27, 1939, as to which lands the claim of the United States shall be extinguished upon the carrying out of this judgment, are hereby disallowed and denied.

"5. That the claims of the United States asserted in said cause against the defendants Northern Pacific Railroad Company and Northern Pacific Railway Company for damages because of the alleged breach by said companies of the requirements of a proviso contained in the Joint Resolution of May 31, 1870, requiring that all lands thereby granted which had not been sold or disposed of at the expiration of five years after the completion of the entire road should be subject to settlement and preemption like other lands at a price to be paid to said companies not exceeding two dollars and fifty cents per acre, are hereby disallowed and denied.

"6. That the claims of the United States asserted in said cause against the Northern Pacific Railroad Company and the Northern Pacific Railway Company for damages arising by reason of the illegal withdrawals of lands within the primary limits of the grants to the Northern Pacific Railroad Company, which withdrawals were made upon the filing of maps of general route of the railroad of said company and the claims of the United States for damages arising by reason of illegal withdrawals of lands made for the benefit of the company within the indemnity limits of the grant, be and the same are disallowed and denied.

"7. That all other claims on the part of the United States for a money judgment asserted in said suit against the defendants or any of them be and the same are hereby disallowed and denied.

"8. This decree shall be and remain a full and complete adjustment, accounting, and settlement of all the rights and claims of the United States against the Northern Pacific Railroad Company, Northern Pacific Railway Company, and any and all persons claiming by, through, or under them, or either of them, and of all the rights and claims of said Northern Pacific Railroad Company, Northern Pacific Railway Company, and any and all persons claiming by, through, or under them, or either of them, against the United States, which have been presented or might have been presented herein under and by virtue of the Act of Congress of July 2, 1864, and Joint Resolution of May 31, 1870, and any and all acts amending or supplementing the same, as provided by the Act of June 25, 1929.

"9. That the execution and delivery to the United States of an instrument or instruments of release by Bankers Trust Company, as successor trustee under the Prior Lien Mortgage, executed by Northern Pacific Railway Company dated November 10, 1896, to Mercantile Trust Company, as trustee, and by City Bank Farmers Trust Company, as trustee of the General Lien Mortgage, executed by Northern Pacific Railway Company dated November 10, 1896, to The Farmers' Loan and Trust Company (now known as City Bank Farmers Trust Company), as trustee, in accordance with Section 321, Part II, Title III, Transportation Act of 1940, releasing and discharging from the lien of said mortgages, respectively, any and all claims to lands, interests in lands, compensation, or reimbursement on account of lands granted, claimed to have been granted, or claimed should have been granted to Northern Railway Company, or any predecessor in interest, in aid of construction of any portion of its railroad (excluding from said release rights of way or station grounds of said Railway Company, lands sold by said Railway Company to innocent purchasers for value prior to September 18, 1940, lands embraced in selections made by said Railway Company and approved by the Secretary of the Interior prior to September 18, 1940, or lands which have been patented or certified to said Railway Company or any predecessor in interest in aid of the construction of its railroad), is for the best interests of the holders of the bonds issued and outstanding under said mortgages respectively and the execution and delivery thereof by said trustees respectively is hereby authorized, approved, ratified, and confirmed.

"10. Except as modified or superseded hereby the decree entered herein on June 27, 1939, is hereby confirmed.

"11. That the defendants pay to the Clerk of this Court all costs of suit not incurred by the United States and not heretofore paid, taxes at $......

"Dated .......

"..........

"Judge of said Court."

VIII. It is understood and agreed that a copy of this stipulation may be filed in the above-entitled cause and shall constitute the consent and request of the parties thereto that a judgment as therein set out be entered in said cause by the Court.

IX. Inasmuch as the Attorney General of the United States will communicate the terms and conditions of this stipulation to the Chairman of the Committee on Public Lands and Surveys of the United States Senate and the Chairman of the Public Lands Committee of the House of Representatives of the United States in order to give said Committees an opportunity to express any objection to the settlement contemplated hereby, it is further understood and agreed that this stipulation shall not be binding upon the parties hereto if objection to such settlement is received by the Attorney General on or before June 16, 1941, from either of said Chairmen. If no such objection is received, this stipulation will be submitted to the above-named Court at the earliest date convenient to Court and parties after June 16, 1941, and shall be effective immediately upon approval by said Court.

Dated this 11th day of April 1941.
UNITED STATES OF AMERICA, *Plaintiff,*
(By direction of the Attorney General.)
[s] NORMAN M. LITTELL,
*Assistant Attorney General.*
NORTHERN PACIFIC RAILWAY COMPANY,
[s] By L. B. DAPONTE, *Its Attorney.*
NORTHERN PACIFIC RAILROAD COMPANY,
[s] By L. B. DAPONTE.
NORTHWESTERN IMPROVEMENT COMPANY,
[s] By L. B. DAPONTE.
BANKERS TRUST COMPANY,
[s] By WHITE & CASE, by L. B. DAPONTE.
TRACY VOUGHT.
[s] TRACY VOUGHT,
By L. B. DAPONTE,
A. N. HEUSTON, *Its Attorneys.*
CITY BANK FARMERS TRUST COMPANY,
[s] By TAYLOR, BLANC, CAPRON & MARSH,
By L. B. DAPONTE,
[s] JOHN B. MARSH,
By L. B. DAPONTE,
JOHN B. MARSH, *Its Attorneys.*